709 P.2d 552

**Mary Deborah BORLAND,**
**Plaintiff-Appellee,**

v.

**SAFECO INSURANCE COMPANY OF AMERICA, a Washington corporation, Defendant-Appellant.**

**No. 1 CA–CIV 7123.**

Court of Appeals of Arizona,
Division 1, Department B.

June 25, 1985.

Review Denied Nov. 5, 1985.

Tucker & Jessen by Kenneth L. Tucker, Phoenix, for plaintiff-appellee.

Kunz & Waugh, Ltd. by Donald R. Kunz, Phoenix, for defendant-appellant.

## OPINION

KLEINSCHMIDT, Judge.

Safeco Insurance Company of America appeals from a judgment for compensatory and punitive damages awarded against it for an untimely failure to pay a claim. Where the facts are in dispute, we accept the version which favors supporting the verdict. They are as follows:

The plaintiff, Mary Deborah Borland, had a homeowner's policy with Safeco. In the fall of 1980, she received a renewal notice from Safeco. She was dissatisfied with the amount of the premium and on the advice of her friend, T. Gale Dake, Esq., she asked her insurance agency, Dean Davidson Insurance Agency, Inc., to try to procure equivalent insurance for less. As a result of this inquiry, Ms. Borland instructed the agency to place the insurance with the Home Insurance Company when the Safeco policy expired. The expiration date was December 8, 1980.

The agency followed these instructions. The very day after the Home policy took effect, on December 9, 1980, Ms. Borland's residence was burgled and she suffered a loss of property which included twelve items of jewelry. Ms. Borland assumed that her insurance with Safeco had been replaced by the Home policy. On December 12, 1980, Dake, acting for Ms. Borland, forwarded a proof of loss to Home Insurance Co. A dispute arose between Ms. Borland and Home as to whether all twelve items of jewelry were covered under the policy or whether six of these had been deleted from the schedule.

Shortly after Ms. Borland suffered the burglary she received a letter from Safeco telling her that it was company policy to allow an insured 35 days following the expiration of a policy to renew it, effective to the date of expiration, by paying the premium within the 35-day period. On December 30, 1980, Ms. Borland sent the renewal premium by check to Safeco at its office in California where it was received on January 2, 1981. She did not advise Safeco of the burglary that had occurred on December 9, nor did she advise anyone at the Davidson agency that she had paid the Safeco premium.

On January 2, 1981, Mr. Dake, who was aware that Ms. Borland had renewed her policy with Safeco, forwarded a proof of loss to Safeco's Phoenix claims office. He did not mention that Ms. Borland was also insured with Home Insurance Co.

On January 4, 1981, Mr. Dake received a call from someone at Safeco whose identity he did not remember. He was told that Safeco was returning his proof of loss to the agency because the claim was not covered by the Safeco policy. Dake told the caller that it was covered by virtue of the grace period Safeco had extended, but the Safeco representative told him he was mistaken and that the policy had been replaced by one issued by Home Insurance Co. Although Dake knew that Ms. Borland had paid the premium to Safeco on December 30, he did not advise the caller of that fact because he said that she did not ask and he did not have time to tell her.

On January 6, 1981, Dake received a telephone call from a woman at the Davidson agency who advised him that Safeco had forwarded the proof of loss to them and that the agency was sending it to Home Insurance Co. She requested the correct policy number and Dake gave it to her. Dake said that he did not advise his caller that Ms. Borland had paid the Safeco premium during the grace period because he did not think he would be believed and he was not going to tell the agency its job. He testified, "I think it's the agent's duty and I think that it's their place to find out if the payment has been made."

On December 29, 1980, the Davidson agency had received notice from Safeco that it could not cancel the Borland policy unless the original policy were returned to it or unless the insured signed a lost policy release. The effect of either action would be to terminate coverage as of the date the Safeco policy expired. Laurie Johnson, an employee of the agency who handled such matters, wrote a letter addressed to Ms. Borland's former husband on January 6, 1981, which Ms. Borland actually received. The letter read:

Re: Insurance policy number SA–OL202012, effective December 8, 1980, to December 8, 1980, HOMEOWNER CANCEL

Dear Mr. and Mrs. Borland:

Enclosed is a Lost Policy Release the company must have signed for the cancellation of this policy. We must have both signature. (sic) Please return this to us as quickly as possible. Thank you for your prompt attention to this matter.

When Ms. Johnson wrote this letter she was unaware of the fact that Ms. Borland no longer wanted to cancel the Safeco policy and had, in fact, paid the renewal premium. Ms. Borland did not understand the consequences of signing the Lost Policy Release and she, in fact, did sign it. Before returning it to the agency, however, she consulted Mr. Dake about the matter and he told her not to return the release.

Nothing further happened until February 2, 1981, when Dake received a telephone call from Sandy Heim, a local claims adjuster for Safeco. She related that she had received an inquiry from Dean Davidson and that she was going to investigate the loss. Dake agreed to allow Ms. Borland to give a written statement about the loss provided that the company would not thereafter bother his client by requiring her to provide the sworn statement called for by the terms of the policy. Heim said she could not promise to forego the sworn statement unless Ms. Borland signed a "non-waiver agreement," an acknowledgement that the company is reserving the right to contest coverage. Dake refused to allow his client to sign such an agreement. Ms. Heim asked if the premium had been paid and Dake responded that he thought that it had been, and that such payment was reflected in the claim file. Although he knew that Ms. Borland had mailed a check to Safeco on December 29 for $841, he did not impart this information to Ms. Heim. Dake did not positively state that the premium had been paid because he did not want to make an absolute statement without personally checking it out. He assumed that Ms. Borland's check was good but didn't know for certain. Ms. Heim then told Dake she could not investigate coverage or investigate the claim unless Ms. Borland signed a non-waiver agreement. She did, however, tell Dake that she would investigate coverage by checking Safeco's file.

On February 3, 1981, Ms. Heim went to the Davidson agency and reviewed the Borland file. She learned Safeco had accepted the renewal premium. At that time the Safeco office in Phoenix had no computer and it was standard practice for Safeco adjusters to determine coverage by consulting the various agencies where policies had been purchased. On the day Heim found that the premium had been paid she wrote Safeco's Los Angeles office advising that she believed there was coverage on this loss.

On February 4, 1981, Dake filed a lawsuit against Safeco on behalf of Ms. Borland. The complaint alleged that Safeco

had intentionally denied coverage and failed to adjust the loss in good faith. Ms. Heim learned of the suit the day it was filed and phoned Dake requesting an extension of time to answer the complaint to permit Safeco time to investigate the loss. The request was denied.

In the meantime Ms. Borland continued having trouble getting Home Insurance Co. to acknowledge coverage for all twelve items of jewelry. The problem arose out of whether or not all twelve pieces of jewelry were indeed included as scheduled items under the policy. On April 10, 1981, Dake filed suit against Home Insurance and that action was consolidated with the suit against Safeco. On November 2, 1981, the trial court granted a motion for summary judgment in favor of Ms. Borland which, in effect, established that the Home Insurance policy covered all twelve pieces of jewelry.

After Ms. Heim had advised Safeco's Los Angeles office that coverage probably existed, she was told by George Umhofer, a Safeco supervisor in the Los Angeles office, that there was coverage for the loss and that the claim should be adjusted. This occurred on March 5. In either March or April she visited the Phoenix office of Home Insurance. She knew that Home Insurance also covered the loss but she thought the matter was complicated by Home's dispute over how much of the jewelry Home insured. Home reconfirmed that it was disputing coverage on some of the items.

According to Safeco, the major delay in payment was due to the confusion as to how to apportion the loss between itself and Home Insurance. Safeco claims that it could not apportion the loss until it knew which items were covered by Home and that it did not learn this until November, 1981. Notwithstanding this, in mid-May, Safeco's Los Angeles office authorized a payment of $4,750 without instructions to Heim as to whether she was to attempt to settle the whole claim for this amount or whether to tender it as partial payment. Heim tried to clarify this but apparently no

further action was taken on the claim for several months. There was also evidence that no one at Safeco who dealt with the case knew how to make the mathematical calculations necessary to a proper apportionment.

Internal memos from Safeco's files show that it raised and rejected the idea of pleading an additional coverage question as a defense to the claim. In one such memo, dated June 17, 1981, the writer said "Our first priority is then to determine what we owe and pay it. Our file [is] insufficient in damage info for that. The claims dept must begin to alert underwriting early on about these premiums."

Sometime in June the matter was turned over to Rodney Ball, another Safeco adjustor in Phoenix. He signed a draft payable to Ms. Borland in the amount of $4,750. By mistake he selected a draft that bore language above the endorsement line that would effect a release of all claims. He testified that he intended to make only a partial payment. In any event, he sent the draft to Safeco's attorney. Safeco's attorney called Dake and discussed the question of apportionment with him, advised him that the draft erroneously bore the release language, and authorized Dake to strike that language out. Dake did not tell Safeco's attorney not to forward the draft and did not tell him that Dake would return it without negotiating it. The draft was sent with a cover letter making it clear that it was a partial payment only and authorized Dake to strike the release language. Dake did "not feel comfortable" with proceeding in that manner so he returned the draft to Safeco's attorney. When the draft was returned, Safeco did not reissue it because, according to Rodney Ball, Dake had raised a question in his transmittal letter about the proper method of apportioning the loss.

The next activity in the case came on November 6, 1981, when Safeco's attorney forwarded a check to Dake for $7,130. The transmittal letter advised that the apportionment had been calculated in Safeco's Los Angeles office before it was known that the trial court had ruled that the

Home Insurance policy covered all twelve items of jewelry. Safeco's attorney also advised Dake that the draft could be negotiated without a release of claims and asked Dake to advise him if there was a problem with respect to the apportionment. Dake wrote in reply that the draft was accepted without a release of any claim. He said that he could not answer the question regarding apportionment without seeing Safeco's calculations and that his own calculations rendered a result different from Safeco's. He did not, however, say what the result of his calculations was. He described the proper formula for apportioning the loss as the:

> Value of item taken divided by the total amount of coverage under both policies for each item times the coverage on Safeco's policy equals the amount Safeco would owe for each item.

According to Dake's testimony, given later, the minimum figure that Safeco would have owed, properly calculated and exclusive of interest, was $7,095.74. Dake's letter reflects that a dispute between Mrs. Borland and Safeco regarding coverage for a Concho belt was still active. This was later resolved in Safeco's favor.

The case proceeded to trial in March, 1982. The main thrust of Ms. Borland's claim went to the inordinate delay involved in getting the loss paid. The jury was instructed that the plaintiff had the burden of proving that Safeco intentionally or recklessly denied or delayed payment of the plaintiff's claim, knowing that it had no reasonable basis for doing so or not caring whether or not it had a reasonable basis for its actions. The jury was also instructed that it could award punitive damages if it found that Safeco acted with the deliberate intent to wrong the plaintiff or with reckless disregard of plaintiff's rights in such a manner as to demonstrate "not mere negligence or unreasonableness, but willful, wanton, malicious or reckless conduct." The court also gave the following instruction defining "reckless disregard":

> The actor's conduct is in 'reckless disregard' of the interests of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of harm to the other, but also involves a high degree of probability that substantial harm will result to him.

Along with the verdicts the jury was given a special interrogatory, the answer to which revealed that the jury believed that as of March 15, 1981, Safeco could have computed an exact sum which was due the insured, and that the sum due was $7,095. The trial court used this verdict to compute the only compensatory damages sought—interest on the policy benefits from the date they should have been paid until the date they were paid. The trial court had refused a jury interrogatory, proffered by Safeco, which inquired as to whether its award was based on a denial of coverage or a delay in paying the claim.

The form of verdict submitted to the jury provided only for a finding in favor of the defendant, or, alternatively, for a finding in favor of the plaintiff for punitive damages only. The jury found for the plaintiff and awarded punitive damages of $70,950.

## BAD FAITH FOR DENYING COVERAGE

Safeco's first argument is that the evidence will not support an award of damages for bad faith and for punitive damages based on the theory that Safeco had denied that its policy covered the loss. We agree. The tort of bad faith arises when an insurance company denies coverage without a reasonable basis for such action. *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866 (1981). All that happened here with respect to a denial of coverage was that Safeco, momentarily, because of action initiated by the insured, believed that the Home policy had been substituted for its own. When it had specific cause to seriously investigate coverage, it did so and acknowledged coverage. There was never any serious question

that once Safeco determined that it had accepted a renewal premium it acknowledged itself bound. There was some delay in straightening out the confusion over coverage. Communications were crossing between the insured, the insured's attorney, the agent and the company. The problem at this stage was nothing more, nor less, than what reasonable people reconcile themselves to in a complex society.

Ms. Borland makes much of Safeco's demand that she execute a non-waiver agreement as a condition of foregoing a sworn statement of loss from her. We think, as did the court in *Hoosier Ins. Co. v. Mangino*, 419 N.E.2d 978, 989 (Ind.App.1981), which discussed such non-waiver agreements in a similar context, that she exaggerates the point. The facts simply won't support a cause of action for bad faith for the denial of coverage.

## BAD FAITH FOR DELAYED PAYMENT

▇▇▇ The delay in adjusting the loss is a different matter. It will support a judgment for compensatory damages for bad faith. Safeco does not contend that mere delay will not support such a claim, and indeed, *Noble* recognizes as much. Where coverage is not contested but the amount of the loss is disputed, the insurer is under a duty to pay any undisputed portion of the claim promptly. Failure to do so amounts to bad faith. *Olson v. Rugloski*, 277 N.W.2d 385 (Minn.1979); *Parrett v. Commercial Union Ins. Co.*, 512 F.Supp. 1074 (E.D.La.1981).

## PUNITIVE DAMAGES

▇▇ We do not believe, however, that the facts of this case will support the judgment for punitive damages. Such an award requires more than the reckless disregard of the insured's interests than is needed to support the bad faith claim. *Farr v. Transamerica Occidental Life Ins. Co.*, 145 Ariz. 1, 699 P.2d 376 (App. 1984). Here, there was no insult or abuse, and no oppressive conduct in the sense that the insurer was using leverage to achieve a

settlement by playing on some urgent need of the insured for the policy proceeds. *See*, for example, *Delgado v. Heritage Life Ins. Co.*, 157 Cal App.3d 262, 203 Cal.Rptr. 672 (1984), where the court held that the jury should have been instructed on punitive damages when the insurer, which had issued a *disability* policy, twice refused to respond to inquiries of the insured about why the claim was rejected and failed to conduct any inquiry into the validity of the claim. The California court placed considerable emphasis on the fact that a disability policy, by its very nature, is one that signals that a claimant may be particularly vulnerable. *See also Maxwell v. Aetna Life Ins. Co.*, 143 Ariz. 205, 693 P.2d 348 (App.1984).

The real question with respect to the issue of punitive damages is whether the evidence, taken most strongly in Ms. Borland's favor, will support an inference that the company was deliberately acting dishonestly. Throughout the trial Ms. Borland had a dual theme. She argued that Safeco had deliberately denied coverage and delayed payment to force her to settle for less than was due, and that but for her good fortune in having an insurance lawyer for a friend, she would have been cheated. Alternatively, she argued that Safeco was inept, inefficient and recklessly indifferent. Safeco, on the other hand, contended that the delay was not unreasonable because it did not know how much of the loss was covered by Home Insurance. It urged that Dake was of no help in straightening things out.

▇▇ If there is a reasonable view of the evidence that will support punitive damages the question should be left to the jury. Such evidence, however, must be more than slight and inconclusive. *Nichols v. Baker*, 101 Ariz. 151, 416 P.2d 584 (1966). In this case, virtually none of the operative facts are in dispute. Those facts which relate to the initial confusion over coverage, for reasons which we have already discussed, should have been relevant only as background. The confusion about coverage was entirely understandable. It

was engendered as much by Ms. Borland and her attorney as it was by Safeco and the insurance agency. Nothing having to do with the initial denial of coverage could contribute to an award of punitive damages. Reasonable minds could not differ on this point.

■ The question narrows to whether the remaining undisputed facts concerning the delay in payment will support the inference that Safeco purposely employed a dishonest scheme. While delay alone could conceivably support such an inference, the facts here will not. To find dishonesty here, most of the testimony of all of the Safeco employees would have to be rejected as deliberately false. One would have to conclude that the company's internal memos were falsified after the fact for purposes of litigation and that the company and its attorney intended to deceive the appellant when it authorized her to cash the first check it sent her without waiving her claim. The evidence given by the Safeco employees is not internally inconsistent in any material way and there is no evidence that this particular insurer has engaged in a pattern of similar delay with respect to other claimants. Reasonable minds could not infer on the basis of this guideline that Safeco was deliberately dishonest.

The only inference that emerges from the undisputed facts is that the employees who handled this claim—and we do not single out just one of them—were untrained or inexperienced, and careless. We agree with Ms. Borland that the uncertainty as to how much of the jewelry the Home Insurance policy covered should not have delayed Safeco in calculating the minimum amount that it owed her. Safeco could have, as counsel suggested at trial, simply calculated its pro-rata share based on the minimum that Home Insurance could have owed. We also agree with Ms. Borland that the inability of Safeco's employees to work the mathematical calculation to arrive at its apportioned share of the loss was negligent.

In deciding whether punitive damages are appropriate in a case like this one, we also think it proper to consider the insured's conduct. From the outset, Ms. Borland was represented by skilled counsel who had a thorough knowledge of insurance law. He could read a policy and learned quickly about grace periods; he had access to the documentary evidence that would prove to the company that a renewal notice had been timely paid; he knew all of his client's rights with respect to proofs of claims, releases, waivers of releases, and apportionment of claims. He knew the law of bad faith. In January, when Dake submitted the claim on a policy which he knew had either been, or was in the process of being cancelled, he made no mention of the payment of the renewal premium during the grace period. In February, when asked about the premium, he answered with imprecision. He filed the lawsuit with celerity. In May he rejected a part payment on a draft which mistakenly bore release language, notwithstanding the fact that he had an ironclad written assurance from the company's attorney that negotiation of the draft would not prejudice his client. When the company and its attorney were unable to apportion, he knew how to make the calculation but he didn't share his knowledge until November. We are aware that the appellant, in its argument to the jury, contended that Dake's conduct was the reason for the confusion and delay and the jury apparently rejected that view. In our opinion the evidence will not support any reasonable inference but that Dake stood by and permitted the appellant to fumble its way into difficulty without seriously trying to straighten things out.

The case of *Olbrich v. Shelby Mut. Ins. Co.*, 13 Ohio App.3d 423, 469 N.E.2d 892 (1983), is similar enough to the fact situation presented here to merit comment. There, the insured made a claim against his homeowner's policy for a suitcase and its contents that had disappeared when he was on vacation. The policy insured against loss of property under circumstances that would suggest that it had been stolen. The

insured made claims against the hotel, the airline, and his insurer. The insured and the insurer engaged in a lengthy exchange of communications as to what was lost, what the airline and hotel had reimbursed the insured, and discussed whether the insured had waived coverage by signing releases which jeopardized the insurer's right of subrogation. The insured, after almost a year of wrangling with the company, sued and recovered compensatory and punitive damages. The Ohio Court of Appeals discussed the type of conduct necessary to support punitive damages, characterized the evidence as reflecting extreme caution on the part of the insurer, and went on to say:

> In consideration of the discrepancies as to the value of the camera, which the trial court later found from the evidence to be worth $150, the delay in payment was apparently not without some justification. Furthermore, the record shows that the insured was *reluctant to provide complete information as to previous settlements with other insurers,* and nothing appears to suggest that the request for such information, as necessary to show a probable theft, was attended by any bad faith or malice. Until the airline and/or the hotel honored the appellee's claim, the circumspectness exercised by the insurer was reasonable, and at no time did the insured explain why the hotel did not pay for the entire loss. Under such circumstances, and after examining the factual patterns of numerous other cases, we are convinced that this record does not portray sufficient 'proof of actual malice, fraud, or insult on the part of the insurer' (Hoskins v. Aetna Life Insurance Co., supra) to support an award of punitive damages in an action based upon breach of contract.

469 N.E.2d at 895 (emphasis added).

Under all of the circumstances, punitive damages are not appropriate and we are authorized to correct the error. *Butane Corp. v. Kirby,* 66 Ariz. 272, 187 P.2d 325 (1947). Since the only award for compensatory damages was based on interest owed from the date the judge found that the company could have computed the sum due, any failure to give Safeco's requested jury interrogatory differentiating damages based on denial of coverage from damages based on delay in payment is harmless.

The judgment for compensatory damages is affirmed. The award of punitive damages is vacated.

GREER and JACOBSON, JJ., concur.