734 P.2d 76

**Linda Ellen FILASKY,
Plaintiff-Appellee,**

v.

**PREFERRED RISK MUTUAL INSURANCE COMPANY, an Iowa corporation, Defendant-Appellant.**

**No. CV–86–0237–T.**

Supreme Court of Arizona.

March 2, 1987.

Reconsideration Denied April 15, 1987.

Patten, Montague & Arnett by Sharon G. Slifko, W. Dea Montague, Tempe, for plaintiff-appellee.

Gust, Rosenfeld, Divelbess & Henderson by Richard A. Segal, Phoenix, for defendant-appellant.

GORDON, Chief Justice.

Plaintiff, Linda Ellen Filasky ("Filasky"), was insured by defendant, Preferred Risk Mutual Insurance Company ("Preferred Risk"), under an automobile insurance policy and homeowner's insurance policy. This case arises from events surrounding settlement of three claims under the two policies. All three claims were handled by Preferred Risk's Tempe office. Throughout the handling of Filasky's three claims, Robert Novak ("Novak") was the claims manager, and Mike Gordon ("Gordon") was the claims adjuster.

Filasky was injured in an automobile accident while working on June 17, 1982. She was hospitalized for approximately two weeks. Preferred Risk paid Filasky's claim for lost-income benefits under her automobile policy by drafts dated May 16, 1983, for $1200, and November 21, 1983, for $7800. Filasky's house was burglarized on approximately June 26, 1982, while she was hospitalized. By draft dated January 25, 1984, Preferred Risk paid Filasky $3900.08 for her theft loss under her homeowner's policy. On July 7, 1982, a rainstorm damaged Filasky's roof and family room. Preferred Risk paid Filasky's water-damage claim by draft dated February 18, 1983, for $650. Both parties agree that all benefits due Filasky under her insurance policies have been paid.

In May 1983, Filasky filed an action against Preferred Risk for breach of duty of good faith, declaratory relief, consumer fraud, intentional infliction of emotional distress, unfair or deceptive insurance practices, and racketeering. A jury returned a verdict in favor of Filasky for $100,000 in

compensatory damages and $1,000,000 in punitive damages.

The trial court denied Preferred Risk's motions for new trial and judgment notwithstanding the verdict. Preferred Risk filed a notice of appeal, and we granted its motion to transfer pursuant to Rule 19, Ariz.R.Civ.App.P. We affirm the jury's finding of bad faith and its compensatory damage award but reverse its award of punitive damages.

## FACTS

### A. Loss-of-Earnings Claim

On June 17, 1982, Filasky was injured in an automobile accident while working and while a passenger in her own automobile driven by her friend, Charles Buff. She was hospitalized for approximately two weeks during which time she was absent from work. Filasky filed a loss-of-earnings claim under the following provisions of her automobile insurance policy:

**Loss of Income Benefits**

To pay eighty-five (85) percent of loss of income resulting from bodily injury, sickness or disease, caused by accident, for the period of continuous total disability beginning the fifteenth day after the accident and terminating one year and fourteen days from the date of the accident, or at death, whichever occurs first, not in excess of $750.00 per month.

\*    \*    \*    \*    \*    \*

**Other insurance**

Insurance afforded under Part II [which includes "Loss of Income Benefits"] shall be excess insurance over any benefits the injured person has the right to receive under any Workmen's Compensation Law.

On July 19, 1982, Gordon visited Filasky and had her sign two release forms. One form authorized Filasky's employer to release information; the other form authorized medical personnel to release information. Preferred Risk never exercised its authority provided by these forms until after Filasky initiated legal action in May 1983. Preferred Risk also never requested Filasky to directly furnish it with her doctors' records.

At some time after July 19, 1982, Gordon learned that Filasky was receiving workers' compensation. He then requested medical information from the State Compensation Department because "[i]t's usually a good source of getting the entire medical picture" and faster than getting information from physicians, who, Novak testified, "are notorious for being dilatory in submitting reports."

At Preferred Risk's request, Filasky permitted Dr. Sidney Stovall to conduct an independent medical exam on September 17, 1982. Stovall concluded that Filasky's physical complaints were "subjective in nature" and was "unable to demonstrate any objective evidence of any injuries being present.... I feel that the patient is physically able to return back to her normal occupation at anytime, and would not anticipate any permanent impairment resulting from the injury of 6/17/82." Preferred Risk received Stovall's report on September 27, 1982.

During Novak's deposition, he said that he believed on September 27, 1982, that Filasky was entitled to some lost-income benefits. When asked why benefits had not yet been paid, he responded: "Because there was the question of how much." He also admitted that he knew Filasky had not worked since the accident and was receiving workers' compensation.

In a letter to Filasky dated October 1, 1982, Novak wrote:

I have just been informed by our Home Office that your policy had been changed to a Standard form two days before this accident. With the change of policy form, there would be no loss of earnings benefit. If you feel there was some error made in making this change, please immediately contact both the agent and myself.

The letter also summarized Stovall's conclusions which, per Novak, precluded recovery of lost income regardless of the type of policy. The letter did inform Filasky that another independent medical exam could be

conducted at her request if she disagreed with Stovall's findings.

Novak attached a copy of Stovall's report to a letter to the State Compensation Department dated October 1, 1982, in which he requested "whatever medical records and reports that you may have so that we can have our medical consultant review them." Gordon's earlier request for medical records had gone unanswered.

Filasky's attorney contacted Novak in October and informed Novak that he believed his client's policy covered lost earnings. Novak then checked with his superiors who subsequently confirmed in November or December that Filasky's policy did provide loss-of-income benefits. He informed Filasky's attorney of the mistake and said he would continue attempting to obtain medical reports from the State Compensation Department.

During the summer and fall of 1982, Filasky's physician was Dr. Frederick Snyder. It was Snyder's opinion that Filasky should not return to work until October 18, 1982, and then only for five or six hours each day. She returned to work in October and worked three to five hours daily for approximately five weeks. Because she could not handle the stress load and work load, her employer terminated her when it reduced its work force.

Novak made a second request for medical information from the State Compensation Department in a letter dated March 21, 1983, and a third request during a telephone conversation on May 6, 1983. He discovered during the telephone conversation that Filasky was still receiving workers' compensation. On May 16, 1983, Preferred Risk issued a check for $1200 to Filasky for lost wages from the fifteenth day following her accident through the date of Stovall's exam.

Filasky commenced legal action on May 18, 1983. Only after litigation ensued did Preferred Risk seek medical records directly from Filasky's physicians—even though Preferred Risk knew as early as October 1, 1982, who her physicians were. Preferred Risk requested the medical information in July 1983 and received it during the following three months. Based on its review of the medical records, Preferred Risk issued a check for $7800 to Filasky on November 21, 1983, for the remainder of lost-income benefits due her.

## B. Theft Claim

Filasky and her husband, Jeff, were separated but not divorced at the time events gave rise to the three claims. Jeff discovered that a burglary had occurred at his wife's home when he went to the home to remove some personal effects on June 26, 1982. Filasky returned home from the hospital on June 28 and reported the theft on July 7 to her agent, Jack Seibert.

Gordon visited the home between July 7 and July 12. Filasky gave Gordon a copy of a handwritten list of stolen items that had been attached to a police report. Gordon testified that he told Filasky that he needed additional information, such as dates of purchase, age of item, model, etc. Filasky testified that Gordon said the handwritten report was "all that he needed to take care of the report that I was filling out for him." Gordon then mailed or personally delivered a proof-of-loss form, inventory sheets, and an instruction letter to Filasky. The instruction letter requested an item description, quantity, owner, date and place of purchase, and replacement cost of each stolen item. Filasky testified that "it was requested that I transfer the [hand]written form onto the Preferred Risk form."

On July 19, 1982, Gordon discussed certain items on the handwritten list with Jeff during an authorized taped telephone conversation. When asked about the ownership of certain camera equipment, Jeff responded: "Uh, to my knowledge, they must have belonged to Linda's boyfriend, Chuck. Because we didn't have any of that equipment to my knowledge." When Gordon asked about a Sony TV, Jeff responded: "I don't know anything about that." When Gordon asked if Jeff knew anything about a Sony stereo, Jeff responded: "No the only stereo that I know about I don't even know what the name of it was...."

In a file memo dated July 23, 1982, Gordon wrote: "Husband told agent [Seibert] wife wanted to claim things that he has at his apartment as stolen; said the insurance company wouldn't know." At trial, Jeff denied ever telling either Gordon or Seibert that his wife wanted to defraud Preferred Risk and that his only comments on her ownership of certain items were those quoted above. Seibert did not testify.

During the week of July 26, 1982, Gordon personally interviewed Filasky. She claimed ownership of all stolen items. At trial, Gordon could not recall asking Filasky about ownership of the camera equipment, Sony TV, and Sony stereo. Filasky testified that Gordon did not challenge her ownership of these items during the interview.

On August 2, 1982, Preferred Risk received Filasky's proof-of-loss form indicating losses of $16,119. Of this amount, approximately $12,500 was for stolen jewelry. The policy, naming both Jeff and Linda as insureds, limited jewelry coverage to $500. Gordon testified that he had told Filasky to list all stolen jewelry and to ignore coverage limits. The entire amount reported stolen then could later be used for income tax verification purposes. Jeff had not signed the proof-of-loss form. The form also did not list an "Owner", "Date of Purchase", and "Place of Purchase" for numerous items, including the camera equipment, TV, and stereo.

On September 7, 1982, Gordon sent Filasky a letter rejecting her theft claim. The letter contained no reasons for rejection. On October 20, 1982, Preferred Risk received a copy of the Filasky divorce decree. It specifically stated that all right, title, and interest to any proceeds from the theft and casualty losses and any proceeds from any personal injuries belonged solely to Linda. At trial, Novak acknowledged having read the above provision.

Filasky asked her attorney to handle her theft claim after its rejection. She then was asked to complete another proof-of-loss form. On December 1, 1982, Filasky called Novak and asked why her earlier claim was rejected. Novak responded, "because it is not completely filled out as to who the owners are and so forth.... [W]e need the places of purchase with the approximate date...." Novak did not mention any ownership concerns. When Filasky requested personal assistance in completing the form, Novak responded, "I will be happy to send you out a form letter we use on simple theft claims and it is quite clear.... [W]e can't afford to have some adjuster come."

Filasky then took a copy of her earlier rejected proof-of-loss form and completed the missing information. She re-submitted this claim on January 21, 1983. Once again the claim was rejected. Filasky testified that she could not remember if Preferred Risk gave reasons at that time for the rejection; no one for Preferred Risk testified that reasons were given at that time. At trial, numerous reasons were suggested. Novak insisted that Jeff had to sign the form because he was a named insured and had a community-property interest. However, Novak also acknowledged receipt of the divorce decree designating Linda as sole owner of any interest in the theft claim. He also acknowledged that Jeff had disclaimed ownership of any stolen items. Another reason Novak gave at trial was that Preferred Risk questioned ownership of items listed as purchased prior to Jeff's move out of the house but of which Jeff had no knowledge. Yet, Filasky testified that no one at Preferred Risk questioned her ownership of the disputed items until her deposition on October 28, 1983. Novak also testified that he was dissatisfied with certain replacement values used on Filasky's proof-of-loss form. If Filasky was unable to remember the exact price of an item, she looked it up in a LaBelle's catalogue and listed the retail price. Novak believed Filasky should have used the cheaper price offered to LaBelle's customers. At trial, however, Novak admitted that it did not matter what replacement price was used by the insured; ultimately it was the claims adjuster's responsibility to determine a reasonable replacement price.

Filasky refused to complete another proof-of-loss form and initiated legal action

in May 1983. During her deposition in October 1983, Filasky became aware for the first time of Preferred Risk's ownership concerns. She explained that the stereo was a gift to her daughter from a friend and the camera equipment and Sony TV were gifts to her from her friend, Buff. Dates of acquisition listed on the January 1983 proof-of-loss form were dates on which her friend and Buff acquired the items. She testified that she had never asked Jeff to sign the proof-of-loss form because she did not want Jeff to know about Buff's gifts to her, nor did she desire to flaunt the gifts in Jeff's face. Only at her deposition did Filasky learn that Gordon had already talked to Jeff.

On January 25, 1984, nineteen months after the burglary, Preferred Risk settled Filasky's theft claim for $3,900.08.

## C. Roof Claim

A rainstorm on July 7, 1982, damaged Filasky's roof and family room. Filasky promptly reported the damage. Gordon inspected the damage on July 19, 1982. Because he did not believe Filasky was insured against structural damage, his damage estimate of $151.20 was limited to interior damage. Filasky argued that she was insured against structural damage and refused to cash Gordon's draft for $51.20.[1] Testimony at trial and the application for homeowner's insurance indicated that the roof was "approved", which meant that Filasky was insured against structural damage to the roof.

Filasky secured two bids in August to repair the structural and interior damage. A & J Inc. estimated the cost of repairs to be $1509.52; Apache Remodelers, Inc. estimated the cost to be $1622.25. Filasky forwarded these estimates to Preferred Risk. Gordon thought that portions of the estimate pertaining to interior damage were too high and did not authorize either bidder to repair the damage.

Gordon revisited the home, and on September 7, 1982, reassessed additional damage caused by a rainstorm in late August or early September. He estimated the to-

tal repair cost to be $316.54. Filasky refused this offer because it "wouldn't even cover the interior repair of the house."

On December 1, 1982, Filasky telephoned Novak and told him that she wanted A & J Inc. to do the repair work. Novak wrote a memo discussing the telephone conversation but Gordon never saw the memo. Five days later, Gordon wrote a letter to Filasky "asking that you select the contractor you desire to do the work so that we can arrive at a final repair figure with him." The letter also called to Filasky's attention for the first time "the provision in the policy that requires that you protect the property from further damage." Filasky did not act on this letter as requested because she thought she had already selected her contractor and had informed Preferred Risk through Novak of her selection.

In a letter to Filasky dated January 5, 1983, Gordon offered a repair estimate of $474.68. This estimate was based on a mid-November telephone discussion with Felton-Antrim Construction Company. No one from Felton-Antrim viewed the damage; Felton-Antrim provided price information to Gordon based on his measurements and details. The letter also suggested that Filasky contact Felton-Antrim and "have them estimate the damages to your ceiling. If they do come up with an estimate higher than our figure, we will be more than happy to reconsider our position."

Filasky contacted Felton-Antrim, who inspected the damage on January 12, 1983, and estimated the repair cost at $867.05. This was the first on-site contractor inspection requested by Preferred Risk since the initial rainstorm in July 1982. Filasky wrote to Gordon on January 27, 1983, advising him of and accepting the Felton-Antrim estimate. Gordon contacted Felton-Antrim, and both parties agreed that Felton-Antrim would repair the damage for $750. Gordon informed Filasky of this arrangement on February 18, 1983. Filasky accepted the arrangement and Preferred Risk settled the claim for $650 that day.

1. The policy contained a $100 deductible.

## BAD FAITH

■ In 1981 we recognized that an insurer has a legal duty to act in good faith when settling its policyholders' claims; violation of that duty constitutes a tort. *Noble v. National American Life Insurance Company*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981). An insurer can challenge claims that are "fairly debatable"; however, it breaches its legal duty when it "intentionally denies or fails to process or pay a claim without a reasonable basis for such action." *Linthicum v. Nationwide Life Insurance Company*, 150 Ariz. 354, 362, 723 P.2d 703, 711 (App.1985), *aff'd*, 150 Ariz. 326, 723 P.2d 675 (1986); *see also Borland v. Safeco Insurance Co.*, 147 Ariz. 195, 199, 709 P.2d 552, 556 (App. 1985); *Farr v. Transamerica Occidental Life Insurance Co.*, 145 Ariz. 1, 5, 699 P.2d 376, 380 (App.1985). We recently wrote:

> To be liable for tort damages, it [the insurer] need only to have intended its act or omission [of denying or failing to provide the insured with the security and protection from calamity which is the object of the relationship], lacking a founded belief that such conduct was permitted by the policy.

> The founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable. In either event, its position is without reasonable basis and subjects it to payment of damages in addition to those traditionally recoverable in a breach of contract action.

*Rawlings v. Apodaca*, 151 Ariz. 149, 160, 726 P.2d 565, 576 (1986) (footnote omitted).

■ Evidence suggests that Preferred Risk's lengthy delays in settling each of Filasky's three claims resulted from Preferred Risk taking a groundless position or failing to adequately investigate its position. The roof claim could have been settled much earlier if Gordon had reviewed the homeowner's policy before insisting that Filasky was not insured against structural damage and if Gordon had initiated a contractor review of the damage long before six months had elapsed after the initial damage. The burglary claim could have been settled much earlier if Preferred Risk's rejection letters had listed reasons for rejection, if Preferred Risk had not insisted on having Jeff's signature on the proof-of-loss form after he denied any ownership interest in the stolen items and after the divorce decree eliminated his community-property interest in any settlement, and if Preferred Risk had confronted Filasky on a timely basis with its concerns about ownership of the camera equipment, stereo, and TV. The lost-benefits claim could have been settled much earlier if Preferred Risk had requested medical information directly from hospitals and physicians after waiting a *reasonable* period of time for the State Compensation Department to deliver its reports. In addition, Novak admitted that some lost-income benefits were due as early as September 27, 1982, but were not paid because the total amount due was questionable. Because the amount of benefits due, rather than coverage, was contested, Preferred Risk had a duty to pay promptly any undisputed portion of the claim. This failure alone amounts to bad faith. *See Borland*, 147 Ariz. at 200, 709 P.2d at 557.

All of the evidence clearly suggests that reasons given by Preferred Risk for delaying settlement of Filasky's three claims were groundless or inadequately investigated and supports the jury's conclusion that Preferred Risk breached its duty to deal with Filasky in good faith.

## COMPENSATORY DAMAGES

■ The jury awarded compensatory damages of $100,000 to Filasky for her emotional distress and attorneys' fees. To recover damages for emotional distress caused by an insurer's bad faith, the insured must demonstrate that the insurer's bad faith resulted in an invasion of property rights. *Farr*, 145 Ariz. at 7, 699 P.2d at 382. Damages for pain, humiliation, or inconvenience, as well as pecuniary losses for expenses such as attorney's fees, trigger an invasion of protected property rights. *See Rawlings*, 151 Ariz. at 161, 726

P.2d at 577; *Farr*, 145 Ariz. at 6–7, 699 P.2d at 382–83.

■ Evidence supports the jury's $100,000 compensatory damage award. Not only did Filasky incur economic losses of approximately $4000 in attorneys' fees and the lost time value of her insurance proceeds, she also endured months of overwhelming inconvenience and frustration caused by Preferred Risk's callous disregard for her plight. The record indicates that Filasky may have been able to maintain her house payments if Preferred Risk had paid her lost wages claim on a timely basis. The record also indicates that Preferred Risk frustrated Filasky's attempts at resolving her claims by engaging in such dilatory tactics as not returning her telephone calls, ignoring her pleas for personal assistance in completing forms, repeating requests with which Filasky had already complied, and rejecting her claims but providing no reasons for doing so.

We do not believe the jury's compensatory damage award of $100,000 was motivated by passion or prejudice; nor do we believe the amount is excessive or grossly disproportionate to the damage incurred. The evidence reveals that Filasky suffered pecuniary losses and damages for frustration, inconvenience, and humiliation. In our opinion, the record fully justifies the jury's award of $100,000 in compensatory damages for emotional distress and attorneys' fees.

## PUNITIVE DAMAGES

■ Punitive damages may be awarded in a bad faith insurance case. *Linthicum*, 150 Ariz. at 332, 723 P.2d at 681; *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. However, punitive damages may not be awarded in a bad faith insurance case absent evidence reflecting "something more" than conduct necessary to establish the tort. *Rawlings*, 151 Ariz. at 161–62, 726 P.2d at 577–78; *Borland*, 147 Ariz. at 200,

709 P.2d at 557; *Farr*, 145 Ariz. at 8, 699 P.2d at 383. We recently articulated a standard for determining whether the requisite "something more" exists:

> To obtain punitive damages, plaintiff must also show that the evil hand that unjustifiably damaged the objectives sought to be reached by the insurance contract was guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the insured. When defendant's motives are shown to be so improper, *or* its conduct so oppressive, outrageous or intolerable that such an "evil mind" may be inferred, punitive damages may be awarded.

*Rawlings*, 151 Ariz. at 162–63, 726 P.2d at 578–79 (emphasis in original; citations omitted).[2]

The trial judge gave the following jury instruction on punitive damages:

> If you find that plaintiff suffered actual damage as a result of the conduct of the defendant on which you base a finding of liability, you may then consider and in your discretion award additional damages known as punitive or exemplary damages against defendant for the sake of example and by way of punishment. In making your determination, a finding that the defendant breached the duty of good faith and fair dealing owed to plaintiff does not by that fact alone make an award of punitive damages appropriate. You must examine both the motive and intent of the defendant's conduct. You may award such damages if, but only if, you find by a preponderance of the evidence that the defendant's conduct amounted to any of the following:
> 1. Deliberate, overt and dishonest dealings such as a willful and knowing failure to process or pay a claim known to be valid;
> 2. Oppressive conduct;

---

**2.** Although *Linthicum* and *Rawlings* were decided subsequent to conduct giving rise to this action, whether we should apply the above-quoted standard only prospectively is not at issue. The above-quoted standard is simply a paraphrased and perhaps more succinctly articulated version of a standard that has long been applied by Arizona appellate courts when determining the propriety of punitive damage awards in bad faith insurance cases.

### 3. Fraud.

\*  \*  \*  \*  \*  \*

■ We first note an absence of words such as "aggravated", "outrageous", "malicious", or "evil mind". However, the judge's use of such words as "Deliberate, overt and dishonest", "willful and knowing", "Oppressive", and "Fraud" sufficiently parallel in meaning the standard articulated in *Rawlings*. We decline to enter into semantic warfare with the trial court and require its jury instructions to incorporate certain phraseology. All we require of the trial judge is that he convey in his instructions to the jury the substance of the applicable legal standard. Here the trial judge satisfied that requirement.[3]

■ We also note that the judge instructed the jury that the burden of proof must be satisfied by a preponderance of the evidence. In *Linthicum*, we held that "the burden of proof for punitive damages is by clear and convincing evidence." 150 Ariz. at 332, 723 P.2d at 681. For reasons articulated in *Hawkins v. Allstate Insurance Company*, 152 Ariz. 490, 503–505, 733 P.2d 1073, 1086–1088 (1987), we limited this portion of *Linthicum* to prospective application. Because the trial of this case occurred prior to *Linthicum*, the burden of proof as articulated in the jury instruction was correct.

■ A jury's decision to award punitive damages should be affirmed if any reasonable evidence exists to support it. However, where the trial court submits the issue to the jury on slight and inconclusive evidence, an appellate court may correct the error. *Borland*, 147 Ariz. at 200, 202, 709 P.2d at 557, 560; *Farr*, 145 Ariz. at 9, 699 P.2d at 384.

■ As already discussed, Preferred Risk's reasons for its dilatory settlement of Filasky's three claims were either groundless or inadequately investigated. This conduct supported the jury's conclusion that Preferred Risk acted in bad faith.

However, evidence of "something more" than indifference to facts and failure to properly and timely investigate an insurance claim must exist before the trial court can instruct the jury on punitive damages. We have read the record and conclude that evidence that Preferred Risk acted toward Filasky in an aggravated, outrageous, malicious, or fraudulent manner, or that Preferred Risk was guided by an evil mind which either consciously sought to injure Filasky or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to Filasky, is slight and inconclusive at best. Therefore, the trial judge erred in submitting the issue of punitive damages to the jury.

### CONCLUSION

We affirm the jury's finding of bad faith and its compensatory damage award of $100,000. We reverse its punitive damage award of $1,000,000 and remand this case to the trial court for entry of judgment consistent with this opinion.

FELDMAN, V.C.J., and CAMERON, J., concur.

HOLOHAN, J., did not participate in the determination of this matter.

HAYS, J., participated in the determination of this matter but retired before this opinion was filed.

---

**3.** However, the trial judge would commit error by including such phrases as "gross negligence" or "reckless disregard" in his jury instructions on punitive damages in a bad faith insurance case.