943 P.2d 808

**Kim VOLAND, Plaintiff/Appellant,**

v.

**FARMERS INSURANCE COMPANY OF ARIZONA; and State Farm Mutual Automobile Insurance Company, Defendants/Appellees.**

No. 2 CA–CV 96–0202.

Court of Appeals of Arizona, Division 2, Department A.

Feb. 11, 1997.

Review Denied Sept. 16, 1997.

Risner & Graham by Kenneth K. Graham, Tucson, for Plaintiff/Appellant.

Chandler, Tullar, Udall & Redhair, L.L.P. by D.B. Udall, Tucson, for Defendant/Appellee Farmers Insurance Company of Arizona.

O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, P.A. by Ralph E. Hunsaker and Christopher Robbins, Phoenix, for Defendant/Appellee State Farm Mutual Automobile Insurance Company.

## OPINION

PELANDER, Presiding Judge.

This case presents an issue of first impression in Arizona: does the implied covenant of good faith and fair dealing require an insurance carrier to pay undisputed portions of uninsured motorist (UM) benefits to its insured/claimant before the latter executes a release or obtains an arbitration award? Concluding that defendants/appellees Farmers and State Farm (the carriers) had no such obligation in this case, the trial court granted summary judgment for them and against their insured, plaintiff/appellant Kim Voland. For the reasons stated below, we affirm.

The parties stipulated to the following facts. In March 1992, plaintiff was injured in an accident caused solely by a negligent uninsured motorist. She made a claim for UM benefits under her State Farm and Farmers auto insurance policies, which had UM limits of $25,000 and $100,000 respectively. In April 1993, plaintiff made a settlement demand for the combined limits of $125,000. By that time plaintiff had submitted to both carriers medical records and bills totalling $5,587.14 and verification for lost wages totalling $5,130.62. Neither carrier disputed that the medical bills were reasonable and causally-related to the accident or that the lost wages were caused by the accident.

By late April 1993, both carriers had determined that the value of plaintiff's UM claim was between $30,000 and $40,000.

Farmers' representative (on behalf of both carriers) wrote to plaintiff's counsel in May, stating "we feel this claim has a fair value of $30,000" and offering to settle for that amount. A few days later plaintiff's counsel wrote to the carriers, demanding arbitration under their policies [1] and requesting them to pay plaintiff the $30,000 which they had offered. Relying in his letter on *Borland v. Safeco Ins. Co.*, 147 Ariz. 195, 709 P.2d 552 (App.1985), and *Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 734 P.2d 76 (1987), plaintiff's counsel requested the carriers to send "drafts totalling the amount of $30,000.00," stated "[w]e can arbitrate the difference," and concluded: "Although I believe that your evaluation of this claim at $30,000.00 is without foundation and itself is evidence of bad faith, it is clear that failure to pay the undisputed amount would be bad faith."

At no time during negotiations did the carriers pay the $30,000 plaintiff's counsel had requested, nor did they pay plaintiff for her undisputed medical expenses or lost wage claim. Plaintiff or her counsel, however, never specifically requested the carriers to pay only the amount of the medical bills and lost earnings. After the carriers increased their joint offer to $50,000 and plaintiff reduced her settlement demand to $80,000 in October 1993, the matter proceeded to arbitration in December and the arbitrators awarded plaintiff $60,000. Plaintiff accepted that award, conditioned on her right to bring this action. Plaintiff's complaint alleged both carriers had an obligation "to pay undisputed amounts owed to her" under their policies, and their failure to do so "constitutes breach of contract and bad faith." This appeal followed the trial court's summary judgment ruling which rejected plaintiff's claims.

■ Because the material facts in this case are undisputed, we determine *de novo* whether the trial court correctly applied the

1. The UM sections of both policies, in virtually identical language, obligated the insurer to pay damages for bodily injury an insured is "legally entitled to collect" (or recover) from the owner or driver of an uninsured motor vehicle, so long as the injury was caused by an accident involving such a vehicle. The policies also provided that if the insurer and insured could not agree on whether the insured is legally entitled to recover damages or the amount of damages, those issues would be submitted for binding arbitration to a three-person panel.

substantive law to those facts. *DeSzendeffy v. Threadgill,* 178 Ariz. 464, 465, 874 P.2d 1021, 1022 (App.1994). We will affirm if the trial court's disposition is correct for any reason. *Glaze v. Marcus,* 151 Ariz. 538, 540, 729 P.2d 342, 344 (App.1986).

In Arizona, insurance contracts include an implied covenant of "good faith and fair dealing," whereby each party is "bound to refrain from any action which would impair the benefits which the other had the right to expect from the contract or the contractual relationship." *Rawlings v. Apodaca,* 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986). " '[T]he relevant inquiry always will focus on the contract itself, to determine what the parties did agree to.' " *Id., quoting Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 385, 710 P.2d 1025, 1040 (1985). However,

> one of the benefits that flow from the insurance contract is the insured's expectation that his insurance company will not wrongfully deprive him of the very security for which he bargained or expose him to the catastrophe from which he sought protection. Conduct by the insurer which does destroy the security or impair the protection purchased breaches the implied covenant of good faith and fair dealing implied in the contract.

*Rawlings,* 151 Ariz. at 155, 726 P.2d at 571.

We have neither been cited to nor found any reported Arizona decisions addressing bad faith allegations relating to a carrier's handling of a UM claim.[2] We see no reason why the implied covenant of good faith and fair dealing should not apply to the UM context. In that regard, we generally agree with the following observations by the Alabama Supreme Court:

> Uninsured motorist coverage ... is a hybrid in that it blends the features of both first-party and third-party coverage. The first-party aspect is evident in that the insured makes a claim under his own contract. At the same time, however, third-party liability principles also are operating in that the coverage requires the insured

to be "legally entitled" to collect—that is, the insured must be able to establish fault on the part of the uninsured motorist and must be able to prove the extent of the damages to which he or she would be entitled. The question arises: when is a carrier of uninsured motorist coverage under a duty to pay its insured's damages?

> There is no universally definitive answer to this question or to the question when an action alleging bad faith may be maintained for the improper handling of an uninsured or underinsured motorist claim; the answer is, of course, dependent upon the facts of each case. Clearly, there is a covenant of good faith and fair dealing between the insurer and the insured, as with direct insurance, but the insurer and the insured occupy adverse positions until the uninsured motorist's liability is fixed. ...

*LeFevre v. Westberry,* 590 So.2d 154, 159 (Ala.1991). Although a UM carrier may assert all defenses which would be available to the uninsured motorist, it still owes a duty of good faith and fair dealing to its insured/claimant. *State Farm Mut. Auto. Ins. Co. v. Shrader,* 882 P.2d 813, 826–27 (Wyo. 1994), *quoting* 2 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 20.4 at 161–62 (2nd ed. 1992).

Plaintiff primarily contends the carriers breached the implied covenant by failing to pay her, in advance, the acknowledged $30,000 "fair value" of her claim. Seizing on the language in the carriers' written settlement offer, plaintiff claims "$30,000.00 was the minimum 'fair value' of the claim as determined jointly by their adjusters." Based on that premise, she maintains the carriers acted in bad faith by withholding that sum from her while the parties followed the policies' arbitration procedure to resolve their dispute about value, or until she executed a release.

Plaintiff's argument is flawed because it overstates the significance of the carriers' choice of the term "fair value" in their $30,-

---

**2.** In *Nationwide Mut. Ins. Co. v. Stevens,* 166 Ariz. 372, 802 P.2d 1071 (App.1990), this court held that plaintiff's bad faith claim against his UM insurer was premature because the uninsured motorist's legal liability had not yet been determined in arbitration.

000 settlement offer. Contrary to plaintiff's contention, that the carriers considered her claim's "fair value" to be $30,000 and therefore offered to settle for that amount does not mean they acknowledged that was "the minimal amount the insurer's own adjuster ha[d] evaluated as being owed to the insured." Rather, the settlement offer was simply a proposal to compromise and resolve the claim, nothing more and nothing less. It represented the carriers' evaluation or best estimate, at that point in time, of what the trier (here, the arbitrators) might award.

The carriers' settlement offer did not bind them if, as it turned out, the claim could not be settled and had to be arbitrated. Nor did it set a "floor" on what the arbitrators had to award or what the carriers ultimately would have to pay. As State Farm correctly notes, "an unaccepted settlement offer does not liquidate the amount of damages or constitute an admission of 'undisputed amounts' owed."

If, in order to avoid a bad faith claim, UM carriers were obligated to pay the amount of their lowest settlement offer without obtaining any release and before any arbitration hearing or award, they would have little if any incentive to settle. Imposing such a requirement would have a chilling effect on genuine settlement evaluations and negotiations. The effect would be to deter settlement and foster litigation, whereas our system of justice encourages settlement and discourages litigation. *See State Farm Mut. Auto. Ins. Co. v. Peaton,* 168 Ariz. 184, 194, 812 P.2d 1002, 1012 (App.1990).

As she did during pre-arbitration negotiations, plaintiff relies on *Borland* and *Filasky* to support her position. In *Borland,* the insured made a theft claim under her homeowner's policy for twelve jewelry items stolen during a burglary of her home. On appeal from a jury verdict for the insured, Division One of this court held that the homeowner's insurer's delay in adjusting the insured's burglary loss claim, for which coverage was not contested, amounted to bad faith and warranted an award of compensatory but not punitive damages. The court ruled that once the insurer determined its policy had been renewed and provided coverage, it easily could have calculated the minimum amount it

owed for the stolen jewelry and should have promptly paid that undisputed portion of the claim:

> Where coverage is not contested but the amount of the loss is disputed, the insurer is under a duty to pay any undisputed portion of the claim promptly. Failure to do so amounts to bad faith.

*Borland,* 147 Ariz. at 200, 709 P.2d at 557.

In *Filasky,* our supreme court upheld a jury's compensatory damage award for the plaintiff/insured's bad faith claim. The insured alleged, *inter alia,* that the carrier unreasonably delayed paying loss of income benefits under her auto insurance policy after an auto accident caused her to miss work. After requesting and reviewing medical records of plaintiff's treating physicians more than a year after the accident, the carrier ultimately paid all lost income benefits due the insured. Nonetheless, the supreme court noted the "lost-benefits claim could have been settled much earlier" and stated:

> In addition, [the carrier] admitted that some lost-income benefits were due as early as [three months after the accident], but were not paid because the total amount due was questionable. Because the amount of benefits due, rather than coverage, was contested, Preferred Risk had a duty to pay promptly any undisputed portion of the claim. This failure alone amounts to bad faith.

*Filasky,* 152 Ariz. at 597, 734 P.2d at 82, *citing Borland,* 147 Ariz. at 200, 709 P.2d at 557.

*Borland* and *Filasky* did not involve UM claims. They are not controlling and do not preclude summary judgment for the carriers here. Unlike the stolen personal property and lost earnings claims involved in those cases, a personal injury claim is unique and generally not divisible or susceptible to relatively precise evaluation or calculation. The "pain and suffering"/general damage elements of a personal injury claim, for example, are inherently flexible and subject to differing and potentially changing evaluations

based on various factors.[3] *See LeFevre,* 590 So.2d at 163 (recognizing the many variables in evaluating and settling personal injury claims). In short, evaluating personal injury claims, and particularly the "general damage" component, is far from an exact science. Oftentimes it is no more precise or predictable than throwing darts at a board.

The out-of-state cases relied on by the court in *Borland* also are inapposite. *Parrett v. Commercial Union Ins. Co.,* 512 F.Supp. 1074 (E.D.La.1981); *Olson v. Rugloski,* 277 N.W.2d 385 (Minn.1979). *Olson* involved a property insurance claim for two trucks which were totally destroyed by fire, and *Parrett* involved a claim for lightning damage to a fishing vessel under a marine hull policy. Such property damage claims, unlike personal injury claims, may be accurately appraised without great difficulty or difference of opinion. In addition, the insurer in *Olson* unreasonably demanded a release before paying the undisputed, minimum amount owed for the fire loss, and a state statute obligated the insurer in *Parrett* to pay any undisputed claims within sixty days after receipt of the insured's proof of loss. Those elements are lacking in this case.

■ For the foregoing reasons, we hold the implied covenant of good faith and fair dealing does not require a UM carrier to pay in advance (that is, before the insured executes a release or obtains an arbitration award) the amount of an unaccepted settlement offer which fully covers all aspects of a UM claim (including special and general damages). *Cf. LeFevre,* 590 So.2d at 162 (holding no bad faith in carrier's failure to tender UM limits for 15 months "because there was a legitimate dispute concerning the amount of damages"). Accordingly, we reject plaintiff's contentions that Farmers and State Farm acted in bad faith by declining her demand to pay her, up front, the $30,000 which they offered and she rejected in settlement.

■ Relying on *Borland* and *Filasky,* plaintiff alternatively contends that, at the very least, the carriers acted in bad faith by failing to pay in advance her undisputed medical bills and lost wages totaling $10,717.76. Even if the rationale and holdings of *Borland* and *Filasky* extended to "undisputed" special damage elements of a UM claim, the carriers' failure to pay plaintiff her special damages before arbitration would not constitute bad faith in this case. First, plaintiff never requested, let alone demanded, the carriers to pay her special damages before arbitration. Rather, plaintiff first raised that claim in this action. Second, as noted above, *Borland* and *Filasky* are distinguishable and did not mandate voluntary, advance partial payments under all circumstances or on "undisputed" elements of UM claims. Nor did those cases sufficiently foreshadow such a requirement. There simply is no direct or controlling authority supporting plaintiff's present position, requiring UM carriers to make gratuitous advance payments which the insured does not request.

Third, there is no claim the carriers delayed or improperly conducted their investigation, delayed the arbitration process, or engaged in any questionable tactics detrimental to plaintiff. The type of evidence suggesting bad faith in the cases plaintiff relies on is noticeably absent here. *See, e.g., Rawlings,* 151 Ariz. at 161, 726 P.2d at 577 (carrier attempted to prevent insureds' suit against the tortfeasor in order to protect its own financial interests, indifferent to the insureds' fire loss, and pursued that objective "by deceit, nondisclosure, reneging on promises, violation of industry custom and deliberate attempts to obfuscate"); *Filasky,* 152 Ariz. at 597, 734 P.2d at 82 (insurer's reasons for delaying settlement of insured's three claims "were groundless or inadequately investigated"); *Borland,* 147 Ariz. at 198–99, 709 P.2d at 555–56 (carrier allegedly "had intentionally denied coverage and failed to adjust the loss in good faith," and the "main thrust of [plaintiff's] claim went to the inordi-

---

**3.** Evaluation of a personal injury (including UM) claim often takes into account such factors as any liability issues (including negligence and causation); the claimant's out-of-pocket expenses, or "special damages"; up-dated medical reports or discovery of old medical records showing pre-existing injury or prior claims; evidence of malingering, subsequent accidents or new injuries; qualifications, appearance and demeanor of the claimant and his or her witnesses; reputation and effectiveness of counsel; findings from any surveillance efforts; and selection and background of the arbitrators.

**454**

nate delay involved in getting the loss paid"). This is not a case where the carriers "intentionally denie[d], fail[ed] to process or pay a claim without a reasonable basis for such action." *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981).

Under the circumstances, any obligation the carriers had to gratuitously pay plaintiff UM benefits in advance for her special damages was, as a matter of law, "fairly debatable." *Noble*, 128 Ariz. at 190, 624 P.2d at 868. *See also Lasma Corp. v. Monarch Ins. Co.*, 159 Ariz. 59, 63–64, 764 P.2d 1118, 1122–23 (1988); *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572. Because the carriers had a reasonable basis for their actions, they cannot be liable for bad faith. *Aetna Cas. & Surety Co. v. Superior Court*, 161 Ariz. 437, 440, 778 P.2d 1333, 1336 (App.1989); *cf. Bucholtz v. Safeco Ins. Co.*, 773 P.2d 590 (Colo. App.1988) (no bad faith where UM carrier stopped negotiating toward settlement after insured demanded arbitration).

Finally, the insurance policies did not require the carriers to offer or make advance payments of UM benefits, for allegedly "undisputed" damages or otherwise, but rather specifically provided for binding arbitration of disputed UM claims. *See LeFevre*, 590 So.2d at 162 (rejecting contention that insurer "acted in bad faith in refusing to make advance payments" under UM coverage and noting even if insured had requested advance payments, carrier "had no contractual obligation" to make them). In any event, there is no evidentiary support for plaintiff's breach of contract claim, which appears to be based solely on her meritless bad faith claim.[4]

Affirmed.

DRUKE, C.J. and MCGREGOR, C.J., Division One, concur.

---

4. We recognize, however, that "an insurer can be held liable for bad faith even when it does not violate any express provision of the insurance contract." *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 189 Ariz. 369, 377, 943 P.2d 729, 737 (Ct. App.1996), *citing Taylor v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 174, 176, 913 P.2d 1092, 1094 (1996); *Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 508, 838 P.2d 1265, 1269 (1992); *Rawlings*, 151 Ariz. at 157, 726 P.2d at 573.