Darci K. DANNER, Frederick Danner and Rita Danner, Plaintiffs-Respondents,

v.

AUTO-OWNERS INSURANCE, Defendant-Appellant-Petitioner.†

Supreme Court

*No. 99–1052. Oral argument February 5, 2001.—Decided July 6, 2001.*

## 2001 WI 90

(Also reported in 629 N.W.2d 159.)

†Motion for Reconsideration denied 10-23-01.

51

For the defendant-appellant-petitioner there were briefs by *Douglas J. Klingberg, Mary Sue Anderson* and *Ruder, Ware & Michler*, Wausau, and oral argument by *Douglas J. Klingberg*.

For the plaintiffs-respondents there was a brief by *William A. Schroeder* and *Sommer, Olk, Schroeder & Payant*, Rhinelander, and oral argument by *Richard E. Sommer*.

An amicus curiae brief was filed by *Mark L. Thomsen, Edward E. Robinson* and *Cannon & Dunphy, S.C.*, Brookfield, on behalf of the Wisconsin Academy of Trial Lawyers.

An amicus curiae brief was filed by *Eric Englund*, Madison, on behalf of the Wisconsin Insurance Alliance.

¶ 1. WILLIAM A. BABLITCH, J. Darci, Frederick and Rita Danner (the Danners) brought a bad faith claim against their insurance carrier, Auto-Owners Insurance Co. (Auto-Owners). The bad faith claim arose out of the Danners' efforts to obtain the payment of benefits pursuant to the policy's underinsured motorist clause. A trial was held on the Danners' bad faith claim. The jury issued a verdict that found in favor of the Danners.

¶ 2. On this review, we consider three issues. First, Auto-Owners argues that because of the basic adversarial relationship that exists between an insured and an insurer in an underinsured claim, a bad faith claim cannot be brought against a UIM carrier until a duty to pay arises which, it is argued, arose in this case after the arbitration hearing. The Danners argue that an underinsured motorist carrier has a duty to deal in good faith with its insured at all times, including during its investigation, evaluation, and process of a claim.

¶ 3. We agree with the Danners. Every insurance contract contains an implied covenant of good faith and fair dealing between the insured and the insurer. When this duty of good faith and fair dealing is breached, and the insured incurs damages as a result of that breach, a claim for bad faith will lie.

¶ 4. Second, Auto-Owners contends that there were several issues in the Danner claim that were fairly debatable and thus a finding of bad faith is precluded. Because we conclude that there is credible evidence to support the jury's verdict, we are unpersuaded by Auto-Owners' argument.

¶ 5. Third, Auto-Owners argues that the circuit court erred in granting the Danners' motion to change the answer to two special verdict questions. We find no

merit in Auto-Owners' arguments. Accordingly, we affirm.

## FACTS

¶ 6. The genesis of this case was a traffic accident that occurred in April 1990 at the intersection of River Street and Lynne Street in Rhinelander, Wisconsin. Tod Kraus was traveling west on River Street. While attempting to negotiate a left turn onto Lynne Street the Kraus vehicle collided into a vehicle driven by Darci Danner (Ms. Danner), which had been proceeding east on River Street.

¶ 7. Kraus claimed that after he activated his turn signal, he stopped to avoid hitting several bicyclists. Despite Kraus' contention, other witnesses stated that he did not signal his turn, there were no bicyclists, and Kraus pulled directly in front of Ms. Danner's on-coming vehicle. Following the accident, Kraus was cited for failure to yield the right-of-way.

¶ 8. Kraus carried a $25,000 liability policy with Dairyland Insurance. At the time of the accident, Ms. Danner lived with her parents. Her father, Frederick Danner, insured the vehicle she was driving with a policy purchased from Auto-Owners Insurance. The Danner policy also insured two other Danner family vehicles, each with $100,000 of underinsured motorist coverage. Wisconsin law at that time permitted the policies to be stacked, thus affording total underinsurance limits of $300,000 in this case.

¶ 9. Auto-Owners retained Crawford and Company Insurance Adjusters (Crawford) to investigate the accident. Crawford's investigation determined that the Kraus vehicle, without signaling, made a left turn directly into the path of the Danner vehicle. Crawford submitted written reports to Auto-Owners. On April

13, 1990, it reported the basic facts concerning how the accident occurred, and stated that there appeared to be no liability on the part of Ms. Danner. The April 13 report also noted that Danner had indicated that she was treated at St. Mary's Hospital emergency room for sore muscles, neck, and head. A Crawford supervisor, William Toivonen, testified at trial. Toivonen stated that Crawford's investigation established that Ms. Danner had sustained some soft tissue injuries. In addition, Crawford's report informed Auto-Owners that an appraiser had assessed the Danner vehicle and reached a settlement with the insured on the loss of the vehicle. Crawford requested Auto-Owners to forward to it a draft in the amount of $4,400, payable to Frederick Danner, which Crawford would exchange for a Proof of Loss.

¶ 10. In a letter dated April 19, 1990, Crawford advised Kraus that it had determined that the Danner vehicle was totaled out as a result of the accident for a loss of $4,600. This amount included the Danners' $200 deductible. The letter also stated: "Our investigation revealed that the accident was a result of your negligence, therefore we will be looking to you for reimbursement of the amounts paid out." Toivonen testified that Crawford later negotiated a settlement on the subrogation with Dairyland. This was settled on an 80/20 basis: 80 percent liability on Kraus and 20 percent on Danner. Dairyland forwarded to Crawford a draft for $3,264.80.

¶ 11. In a subsequent report dated May 25, 1990, Crawford reported to Auto-Owners that a witness had indicated that Kraus' vehicle did not have its signal lights on and that the Danner vehicle was traveling at a proper speed. The report also noted that Kraus had indicated that his turn signal was on and that he

believed that the Danner vehicle was exceeding the posted speed limit of 25 m.p.h.

¶ 12. In a report dated September 12, 1990, Crawford stated that it was forwarding to Auto-Owners medical records obtained from the emergency room at Sacred Heart-St. Mary's Hospital, where Ms. Danner had been taken after the accident, and a copy of a record from her chiropractor.

¶ 13. On November 8, 1990, Crawford informed Auto-Owners that it had been advised by Rita Danner, Ms. Danner's mother, that Darci was continuing to have back and leg pain and was consulting a chiropractor. Subsequently, in January 1991 Auto-Owners asked Crawford to close the file in the Danner case because the only item left in the file was medical payments for Ms. Danner.

¶ 14. In a letter dated May 13, 1991, counsel for the Danners notified Auto-Owners that the underinsured motorist coverage under the Auto-Owners' policy may be applicable. In its written reply, Auto-Owners asked counsel to advise Auto-Owners as to the underlying limits under Tod Kraus' policy and requested any medical information or reports counsel had concerning Danner. In December 1991 medical reports were forwarded to Auto-Owners. Additional medical information was forwarded to Auto-Owners on January 23, 1992. As to Auto-Owners' request of the Danners for a copy of Kraus' liability policy, in a letter dated April 1992 counsel for Danner informed Auto-Owners that although it had twice requested that information, Kraus' insurer refused to provide it.

¶ 15. In May 1992 Ms. Danner, who was diagnosed with a herniated disc, underwent fusion surgery on her back. Her physician believed that because she was neurologically intact before the accident and had a

disc herniation subsequent thereto, that the accident caused this back problem.

¶ 16. In September 1992 counsel for the Danners forwarded additional medical reports to Auto-Owners. This letter notified Auto-Owners that a demand had been made of Dairyland Insurance Co., Kraus' insurer, for the full policy limits of $25,000. The letter stated that Dairyland had rejected a similar demand made in May on the grounds that Ms. Danner's current medical status was in part caused by pre-existing medical conditions.

¶ 17. In November 1992 Danner filed an action in Oneida County Circuit Court against Kraus, Dairyland, and Auto-Owners. In response, Auto-Owners retained attorney Todd McEldowney (McEldowney).

¶ 18. In May 1993 McEldowney filed a report with Auto-Owners. McEldowney described the elements of the accident just as Crawford had previously done: Kraus made a left turn in front of the Danner vehicle and was struck by Ms. Danner; Ms. Danner contended that Kraus did not have his blinker on; Kraus claimed that he had stopped to yield to a bicycle and then proceeded after illuminating the vehicle's left blinker. McEldowney's report noted that three witnesses indicated that the Kraus vehicle did not have its left turn signal on, and that the Danner vehicle was operating at a prudent rate of speed. McEldowney also reported that the witnesses agreed that Danner did not have enough time to avoid hitting the truck, and that the accident was caused by Kraus. On the issue of liability, McEldowney advised Auto-Owners that a 90–10 split of negligence would not be inconceivable and that a jury would likely believe that the accident caused her physical complaints and award Danner over $22,000 in medical specials. In his damage evaluation, McEldow-

ney reported that prior to the accident Danner had been in several prior motor vehicle accidents, including a roll-over accident in 1989, and had complained of low back pain and occasional pain in her left leg.

¶ 19. At the same time, Dairyland was evaluating Danner's pre–1990 medical records. Dairyland determined that in 1986 Danner had complained of back pain after water skiing and after participating in a gymnastic activity. Dairyland also was aware that after the 1989 roll-over accident Danner again complained of back and leg pain. Dairyland's analysis also revealed that following the accident with Kraus, Danner again sought chiropractic treatment for back pain. At the same time, Ms. Danner was working for the Wisconsin Conservation Corps in a job that required frequent lifting, bending, and at times working with a chain saw.

¶ 20. In March 1993 Dairyland believed that there was a question regarding causation of injury sustained by Ms. Danner because of the earlier motor vehicle accidents. Dairyland believed, however, that if a jury accepted that surgery was necessitated as a result of the automobile accident with Kraus, then the verdict would be above the policy limits because the medical costs alone approached the $25,000 limits of the policy.

¶ 21. In June 1993 McEldowney asked Auto-Owners whether to invoke the policy's voluntary arbitration provision. This clause in the policy provided in part:

> We and a person entitled to coverage under this agreement may not agree as to whether that person is entitled to recover damages or the amount of damages. In that case, either party may make a written demand for arbitration. If a demand is

made, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that a judge of a court having jurisdiction make the selection. Each party will pay its own arbitrator and bear equally the other expenses of arbitration.

McEldowney was advised by Auto-Owners to "leave it in litigation. We are not interested in mediation or arb."

¶ 22. In August McEldowney sought additional information from Ms. Danner concerning medical expenses, as well as employment and school authorizations. At this point, the Danners invoked the policy's arbitration provision.

¶ 23. In December 1993 the circuit court ordered that the action between the Danners and Dairyland continue, but that Auto-Owners' participation in the suit was stayed.

¶ 24. In May 1994 McEldowney wrote to Kraus' attorney and stated:

> In the meantime, from my obviously biased perspective, I would like to see this case settled for less than your policy limits. I would tend to believe that Auto-Owners Insurance Company would be willing to pay an amount to your Company to help defray costs, settlement offers, etc., provided that you would be able to resolve this case for less than policy limits.

¶ 25. At the same time, McEldowney reported to Auto-Owners:

> Due to the substantial amount of medical specials in this case, [counsel for Kraus] is considering offering policy limits. I have attempted to talk her out of that telephonically and have followed up said conversations with the attached letter.

If we can get out from under this case via a payment on behalf of Kraus for less than policy limits, it may be in our best interest to offer some money to Sentry Insurance. Realistically, if things continue the way they have been, it would not surprise me if the policy limits are tendered and that this matter will be going into arbitration.

¶ 26. That same month, Dairyland tendered Kraus' policy limits of $25,000 contingent upon a full release of Kraus and Dairyland. Auto-Owners' Green Bay claims office advised its home office legal department as follows:

As you know, we put all discovery on the back burner, awaiting the outcome of Dairyland's claim. There was the possibility that they would settle within their limits and we would be out of this matter. However, since that has not happened and they have now paid their limits, we will resume our investigation of the injury and the medical discovery.

¶ 27. In June, McEldowney notified counsel for the Danners that Auto-Owners was willing to agree to the settlement proposal and released its subrogation rights against Kraus and Dairyland. In July 1994 Ms. Danner executed a release of Dairyland and Kraus.

¶ 28. By August 1994 Auto-Owners had copies of the depositions taken in the circuit court proceeding. Counsel for the Danners notified McEldowney that their settlement demand was $300,000. In response McEldowney informed them that it was Auto-Owners' position that only $100,000 of underinsured motorist benefits were available under their policy. Counsel for the Danners advised McEldowney that three $100,000 underinsured motorist coverages provided in the Dan-

60

ner policy are stacked for the purpose of determining the amount of coverage available. Auto-Owners subsequently offered to settle the Danners' claim for $10,000.

¶ 29. In November 1994, in response to a request for admissions, Auto-Owners denied that $300,000 was their liability limit under the three policies and denied that the amount paid by Dairyland should be deducted from the Danners' total damages instead of Auto-Owners total liability limits. In December McEldowney advised the Danners' attorney that he believed the three $100,000 policies should be stacked and would discuss his views with Auto-Owners.

¶ 30. At the end of 1994 McEldowney submitted to Auto-Owners an updated case summary and evaluation. He again estimated that negligence in the case would be split 90–10. Concerning injuries, he noted that Ms. Danner had been treated for two herniated discs with accompanying pain in her leg and back and had undergone one disc operation. McEldowney also noted that prior to the accident Dr. Robert Kitzman had treated Ms. Danner for low back pain and occasional pain in her left leg. McEldowney wrote that it would be possible for a jury to award $75,000 over and above the approximately $22,000 in medical expenses already incurred.

¶ 31. In February 1995 Dr. Joseph Tambornino examined Danner at the behest of Auto-Owners. Dr. Tambornino reported that Danner had pre-existing back pain, and that there did not appear to be a clear relationship between the accident and her subsequent back problem requiring surgery.

¶ 32. In a letter dated April 7, 1995, Auto-Owners offered to settle the case for $50,000. In June, the Danners indicated a willingness to accept $175,000.

¶ 33. In April 1995 Robert Ellis of Auto-Owners legal department, who was responsible for valuing the claim, wrote to the Green Bay claims office that he did not "have a good handle on the limits issue" and was unsure whether the Danners would be able to stack all three policies. McEldowney, however, testified that he never had any doubt that Ms. Danner was a member of her parent's household, thus enabling her to stack the policies.

¶ 34. Arbitration was scheduled to occur on July 31, 1995. Throughout July negotiations between the parties continued.

¶ 35. On July 24, 1995, McEldowney and counsel for the Danners were notified that the three arbitrators had considered whether the issue of "bad faith" would be arbitrated. The arbitrators concluded that arbitration would be limited to damages and liability as to the automobile accident and that, presuming that there is a viable bad faith issue after the arbitrators' award, that the circuit court was the proper place to litigate that issue.

¶ 36. On July 31, 1995, the arbitration hearing occurred. The arbitrators awarded the Danners $220,050. Auto-Owners forwarded a draft for $196,797.39. Auto-Owners deducted $25,000 from the arbitrators' award, concluding that this amount represented Dairyland's payment and should be deducted to prevent double recovery. Subsequently the circuit court granted the Danners' motion to confirm the entire award and entered judgment for $220,050. Auto-Owners forwarded the remaining $25,000 to the Danners.

¶ 37. In December 1995 the Danners brought this bad faith action against Auto-Owners. In their complaint, the Danners' alleged that Auto-Owners

acted in bad faith in refusing to honor their claim and make prompt monetary settlement by:

 A. Failing to initiate and conclude a claims investigation with all reasonable dispatch and failing to take prompt action to locate and interview witnesses to the accident;

 B. Recklessly ignoring and disregarding the facts made known by the plaintiffs with respect to liability and damages;

 C. Knowingly misrepresenting to the plaintiffs the pertinent facts relating to the extent of coverage available by attempting to invoke reducing clauses and limitations on stacking of policy coverages which were contrary to the state of the law at that time; and

 D. Failing to attempt in good faith to effectuate fair and equitable settlement of the plaintiffs' claims when liability was clear;

 E. In utilizing the Arbitration process as a means of delaying prompt payment of the claim, thereby causing the plaintiffs unnecessary expense and loss of use of monies rightfully belonging to them as well as the costs incurred in preparation for and presentation of the claim at Arbitration and the expense of attorneys fees incurred in doing so.

 F. In knowingly failing to exercise honest and informed judgment on the undisputed facts which were known to them, or should have been known to them had they conducted an honest and intelligent investigation of the facts underlying the liability issues and damage issues.

 ¶ 38. The jury found that Auto-Owners exercised bad faith by denying the Danners' claim. The jury awarded $125,000 in attorneys' fees for prosecuting the bad faith action, but awarded no attorneys' fees for the

underlying claim or any other compensatory or punitive damages.

¶ 39. At post-verdict proceedings, the circuit court denied Auto-Owners' motion for judgment notwithstanding the verdict. It granted the Danners' motion to change the attorneys' fees award on the bad faith claim from $125,000 to $142,967.10 and from -0- to $81,012.97 for attorneys' fees on the underlying claim.

¶ 40. In an unpublished opinion, the court of appeals affirmed. *Danner v. Auto-Owners Ins.*, No. 99–1052, unpublished slip op. (Wis. Ct. App. May 2, 2000). This court granted review. We now affirm the decision of the court of appeals.

## ANALYSIS

### I

■

¶ 41. The first issue we consider is whether an underinsured motor carrier has a duty to act in good faith at all times with its insured. Auto-Owners raised this issue in a motion for judgment notwithstanding the verdict pursuant to Wis. Stat. § 805.14(5)(b) (1997–98).[1] This motion was denied by the Honorable

---

[1] Wisconsin Stat. § 805.14(5) provides as follows:

Motions after verdict. (a) Motion for judgment. A motion for judgment on the verdict is not required. If no motion after verdict is filed within the time period specified in s. 805.16, judgment shall be entered on the verdict at the expiration thereof. If a motion after verdict is timely filed, judgment on the verdict shall be entered upon denial of the motion.

. . .

(c) Motion to change answer. Any party may move the court to change an answer in the verdict on the ground of insufficiency of the evidence to sustain the answer.

Robert A. Kennedy, Circuit Court Judge for Forest and Florence Counties. A motion for judgment notwithstanding the verdict "does not challenge the sufficiency of the evidence to support the verdict." *Mgmt. Comp. Serv. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996). Instead, the movant asserts that "for reasons evident in the record which bear upon matters not included in the verdict, the movant should have judgment." Wis. Stat. § 805.14(5)(b). Review of the circuit court's decision on a motion for judgment not withstanding the verdict presents a question of law that we review independently of the decisions reached by the court of appeals and circuit court, although with the benefit of their analysis. *See Mgmt. Comp. Serv.*, 206 Wis. 2d at 177.

¶ 42.　Auto-Owners asserts that a bad faith claim against an underinsured motorist carrier is fundamentally different from other first-party bad faith claims. It contends that prior to a finding of liability by verdict or arbitration, the insurer takes the place of the underinsured (or uninsured) motorist and may raise any defense that was available to the uninsured or under-

---

(d)　Motion for directed verdict. A party who has made a motion for directed verdict or dismissal on which the court has not ruled pending return of the verdict may renew the motion after verdict. In the event the motion is granted, the court may enter judgment in accordance with the motion.

(e)　Preliminary motions. It is not necessary to move for a directed verdict or dismissal prior to submission of the case to the jury in order to move subsequently for a judgment notwithstanding the verdict or to change answer.

(f)　Telephone hearings. Motions under this subsection may be heard as prescribed in s. 807.13.

All statutory references are to the 1997–98 volume, unless noted otherwise.

insured motorist; the insurer is in an adversarial relationship with its insured.[2]

¶ 43. Auto-Owners contends no cause of action for bad faith failure to pay can arise until after the arbitration award established legal entitlement and imposed a duty. In this case, the underinsured motorist insurance contract provided that Auto-Owners "will pay all sums which an insured person is legally entitled to recover as damages: (1) because of bodily injury, sickness or disease, including resulting death; and (2) arising out of the ownership, maintenance, or sue of an automobile which is underinsured." The contract also contained an arbitration clause, which stated in part: "We and a person entitled to coverage under this agreement may not agree as to whether that person is entitled to recover damages or the amount of damages. In that case, either party may make a written demand for arbitration." Auto-Owners argues that under the insurance policy's plain language, it had no duty to pay until it was determined that the Danners were legally entitled to recover damages. Auto-Owners contends that without a contractual duty to pay, there can be no delay in payment and no basis for a bad faith claim.

¶ 44. We begin by considering Auto-Owners' argument that, as a matter of law, no cause of action for bad faith can arise until after an arbitration award imposed a duty. To properly evaluate Auto-Owners' arguments we must first examine the tort of bad faith in Wisconsin.

¶ 45. This court recognized an independent tort cause of action for bad faith in first-party insurance cases in *Anderson v. Continental Insurance Co.*, 85 Wis.

---

[2] This view is also set forth in Arnold P. Anderson, *Wisconsin Insurance Law* § 9.12, at 9–54 to–55 (4th ed. 1998).

2d 675, 271 N.W.2d 368 (1978). The first-party insurance at issue in *Anderson* was a homeowner's policy. The insureds brought a claim of bad faith against the insurer, alleging that it had "acted in bad faith intentionally and maliciously for the purpose of harassing the plaintiffs to discourage them from asserting their rightful claim and to prevent them from collecting the amounts due under the insurance policy." *Id.* at 684. In adopting the tort of bad faith, we followed the reasoning of the California Supreme Court in *Gruenberg v. Aetna Insurance Co.*, 510 P.2d 1032 (Cal. 1973). *Id.* at 690. In *Gruenberg*, the California Supreme Court determined that the basis for this tort was a breach of the implied covenant of good faith and fair dealing that is present in every insurance contract. *Gruenberg*, 510 P.2d at 1037. "The duty violated—that of dealing fairly and in good faith with the other party to a contract of insurance—is a duty imposed by law, not one arising from the terms of the contract itself. In other words, this duty of dealing fairly and in good faith is nonconsensual in origin rather than consensual. Breach of this duty is a tort." *Id.*

¶ 46. Our opinion in *Anderson* similarly relied upon the duty of good faith and fair dealing. First, we noted that the rational for *Gruenberg* was rooted in Wisconsin precedent, *Hilker v. Western Automobile Insurance Co.*, 204 Wis. 1, 231 N.W. 257, 235 N.W. 413 (1930, 1931). *Anderson*, 85 Wis. 2d at 687. In *Hilker*, the plaintiff had an automobile insurance policy that limited liability to $5,000 per person. Plaintiff's vehicle struck a child. An action was brought against the plaintiff and a $10,500 judgment was recovered. The plaintiff then brought a claim against the insurer, seeking to recover the $5,500 he was required to pay in excess of the coverage of the policy. Plaintiff further

alleged that the insurance company acted in bad faith in conducting the defense of the third-party's action, in withholding information as to the action, and in failing to settle the action for a sum less than $5,000. *Hilker*, 204 Wis. at 3. A jury found for the plaintiff and the insurer appealed. In affirming the judgment for plaintiff, *Hilker* recognized the implied covenant of good faith and fair dealing in every contract. *Id.* at 4 (citing *Brassil v. Maryland Cas. Co.*, 104 N.E. 622 (N.Y. 1914)).

¶ 47. Our decision in *Anderson* built upon the *Hilker* analysis:

> The rationale which recognizes an ancillary duty on an insurance company to exercise good faith in the settlement of third-party claims is equally applicable and of equal importance when the insured seeks payment of legitimate damages from his own insurance company. That such a duty arises out of the relationship between the contracting parties themselves cannot be doubted. As black letter law, Restatement, *Law of Contracts* 2d, sec. 231 (Tentative Drafts Nos. 1–7, Rev. and Edited, 1973), provides: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

*Anderson*, 85 Wis. 2d at 688–89.

¶ 48. In *Anderson,* this court incorporated the following statement from *Gruenberg* as the law of Wisconsin:

> "It is manifest that a common legal principle underlies all of the foregoing decisions; namely, that *in every insurance contract there is an implied covenant of good faith and fair dealing.* The duty to so act is imminent in the contract whether the company is attending to the claims of third persons

against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort."

*Id.* at 689 (quoting *Gruenberg,* 510 P.2d at 1032) (emphasis supplied).

¶ 49. Our decision in *Anderson* emphasized that a special duty between the parties arose as a result of the relationship created by the contract. Breach of this special duty is a tort and is unrelated to contract damages. *Id.* at 686. This special duty of good faith and fair dealing runs throughout the contract relationship between the insurer and the insured. Pursuant to our decision in *Anderson,* the duty of good faith and fair dealing is firmly established as present in first-party insurance contracts. Breach of this duty may give rise to tort damages because an insurer has a "special 'fiduciary' relationship" to its insured. *DeChant v. Monarch Life Ins. Co.,* 200 Wis. 2d 559, 570, 547 N.W.2d 592 (1996).[3] The present case concerns underinsured

[3] The opinions of this court have consistently characterized the cause of action identified in *Anderson v. Continental Insurance Co.,* 85 Wis. 2d 675, 271 N.W.2d 368 (1978), as one based upon a "fiduciary" relationship or a relationship analogous to a fiduciary. *DeChant v. Monarch Life Ins. Co,* 200 Wis. 2d 559, 570, 547 N.W.2d 592 (1996); *Elliott v. Donahue,* 169 Wis. 2d 310, 317 n.1, 485 N.W.2d 403 (1992) (noting that in *Anderson,* "this court explained that the tort of bad faith results from a breach of the insurer's fiduciary duty imposed as a consequence of the relationship established by the insurance contract"); *Kranzush v. Badger State Mut. Cas. Co.,* 103 Wis. 2d 56, 64, 307 N.W.2d 256 (1981) ("The heart of the tort recognized in *Anderson* is the fiduciary relationship between the insurer and the insured and the insurer's breach of the duty of good faith and fair dealing implicit in every contract."); *Davis v. Allstate Ins. Co.,* 101 Wis.

motorist coverage. Underinsured motorist coverage is first-party insurance.[4]

¶ 50. Another California case, *Richardson v. Employers Liability Assurance Corp.*, 25 Cal. App.3d 232 (Ct. App. 1972), decided one year before *Gruenberg*, illustrates the operation of the duty of good faith.[5] In *Richardson* the plaintiffs obtained a judgment against their insurer based upon the refusal of the insurer to settle in good faith, without arbitration, the insured's claim on their uninsured motorist coverage. In discussing the insurer's actions the *Richardson* court wrote:

> [The insurer] deliberately, willfully and in bad faith withheld payment of the [insured's] claim months after it knew the claim to be completely valid; it forced an arbitration hearing on a claim against which it already knew that it had no defense; even after the award was made, it instructed its local office to attempt "to make the best possible settle-

---

2d 1, 7–8, 289 N.W.2d 373 (1981) ("Bad faith is an intentional tort which results from a breach of duty imposed as a consequence of the relationship established by contract. The duty imposed on an insurance company has been characterized as being analogous to that of a fiduciary." (internal quotation marks and citation omitted)).

[4] *See* Dennis J. Wall, *Litigation and Prevention of Insurer Bad Faith* § 9.01, at 384 (2d ed. 1994) listing examples of first-party insurance and including in that list uninsured and underinsured motorist coverage; 3 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 31.4, at 5 (Revised 2d ed. 2001).

[5] *Richardson v. Employers Liability Assurance Corp.*, 25 Cal. App.3d 232 (Ct. App. 1972) was disapproved of by *Gruenberg v. Aetna Insurance Co.*, 9 Cal. 3d 566, 580–81, n. 10 (1973). This disapproval, however, was directed at *Richardson*'s discussion of the criteria for an award of damages for anxiety and emotional distress.

ment," and forced plaintiffs to resort to litigation to have the award judicially confirmed. This conduct toward its own insured was unconscionable, and constituted a tortious breach of contract.

*Id.* at 239. In the present case, of course, we are not concerned with tortious breach of contract; our analysis rests upon the breach of the covenant of good faith and fair dealing that is implied by law into the insurance contract. *Richardson* illustrates how a breach of the duty of good faith and fair dealing may arise in the investigation, evaluation and processing of a claim.

¶ 51. Insurance policies are unique contracts. *DeChant*, 200 Wis. 2d at 570. Underinsured motorist coverage is not purchased to obtain commercial advantage but is instead obtained as protection against calamity. *Egan v. Mut. of Omaha Ins. Co.*, 620 P.2d 141, 145 (Cal. 1979) (discussing the implied covenant of good faith and fair dealing in a disability insurance policy). Although our tort law intends that the party at fault should pay the cost of injuries he or she has caused, not all operators of motor vehicles have sufficient financial resources or insurance to do so. Underinsured motorist coverage provides "first party coverage that affords compensation for injured persons whenever a tortfeasor is inadequately insured". 3 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 31.4, at 5 (Revised 2d ed. 2001). Having paid a premium for this first-party coverage, an insured has a right to be protected from acts of bad faith by the insurer prior to a final determination that he or she is legally entitled to payment under the insurance contract.

¶ 52. With first-party insurance, the insurer establishes "the conditions for both the presentment

and payment of claims." *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986). The insurer has what the Arizona Supreme Court has characterized as "an almost adjudicatory responsibility." *Id.* "The insurer evaluates the claim, determines whether it falls within the coverage provided, assesses its monetary value, decides on its validity and passes upon payment." *Id.* In the case at hand, for example, a condition of the payment of benefits was the exhaustion of the tortfeasor's limits of liability. Evidence submitted at the trial showed that McEldowney, acting on behalf of Auto-Owners, sought to convince Dairyland to not pay its liability limits, thus cutting off any duty to pay benefits from the Auto-Owners' policy. Dairyland did, nevertheless, pay the full limits of Kraus' policy to the Danners. However this illustrates the significant amount of control, and potential exposure to economic loss, that can occur prior to a final determination of liability.

¶ 53. If the insured disagrees with the insurer's decision, he or she does have remedies to pursue. Yet "the very invocation of those remedies detracts significantly from the protection or security which was the object of the transaction." *Id.*

¶ 54. We disagree with Auto-Owners' argument that until arbitration established a legal obligation to pay, there is no duty to pay and, accordingly, no predicate for a bad faith claim. An action based upon bad faith is founded upon a breach of the covenant of good faith and fair dealing implied by law. Whether or not a claim of bad faith may occur in the absence of coverage is not an issue in this case because the arbitration award established legal entitlement and imposed upon

Auto-Owners a duty to pay.[6] Therefore, we hold that every insurance contract from its inception has an implied covenant of good faith and fair dealing between the insured and the insurer. When this duty of good faith and fair dealing is breached, and the insured incurs damages as a result of that breach, a claim for bad faith will lie.

¶ 55. Auto-Owners asserts that a claim of bad faith against an underinsured motorist carrier is fundamentally different from other first-party bad faith claims. In its view, the insurer and the insured occupy an adversarial position and as a result, no cause of action for bad faith can arise until after the arbitration award established legal entitlement and imposed a duty to pay benefits. In other words, it is Auto-Owners' view there can be no bad faith claim against an underinsured motorist carrier for the investigation, evaluation or processing of a claim.

¶ 56. In support of its position, Auto-Owners cites cases from other jurisdictions where courts have held that, notwithstanding the nature of the insurance contract or the premiums that have been paid for coverage, the insured and insurance carrier are adversaries until and unless an award or judgment is made in favor of the insured. *LeFevre v. Westberry and State Farm Mut. Auto. Ins. Co.*, 590 So. 2d 154 (Ala. 1991) (discussing uninsured motorist coverage); *Quick v. State Farm Mut. Auto. Ins. Co.*, 429 So. 2d 1033 (Ala. 1983) (discussing uninsured motorist coverage). In *LeFevre* the Alabama Supreme Court characterized uninsured motorist coverage as a "hybrid" instrument containing

---

[6] We do not address in this case whether an insured may recover damages for first-party bad faith when a court determines that the policy does not cover the insured's claim.

features of both first-party and third-party coverage. *LeFevre*, 590 S. 2d at 159.

¶ 57. Other jurisdictions, however, have rejected this "hybrid" view. In *State Farm Mutual Automobile Insurance Co. v. Shrader*, 882 P.2d 813 (Wyo. 1994), the Wyoming Supreme Court determined that the "hybrid" view was premised upon the idea that the insurer is adverse to the insured because it may assert the defenses that would be available to the uninsured motorist. It concluded, however, that " 'substituted liability' does not obviate the insurer's duty of good faith and fair dealing." *Id.* at 827.[7] The Arizona court of

---

[7] *State Farm Mutual Automobile Insurance Co. v. Shrader*, 882 P.2d 813 (Wyo. 1994), like the two Alabama cases cited in ¶ 50, is a case concerning uninsured motorist coverage. In its argument Auto-Owners contends that a bad faith claim against an uninsured motorist carrier, as well as an underinsured motorist insurance carrier, should be analyzed differently than other first-party bad faith claims. In support of its position, Auto-Owners cites cases examining uninsured motorist claims, although the present case concerns underinsured motorist coverage. In our analysis, we have also examined cases discussing uninsured motorist coverage as well as underinsured motorist coverage. We want to particularly note, however, that our analysis might be somewhat different if this case concerned uninsured motorist coverage. Every policy of motor vehicle liability insurance must contain an uninsured motorist provision. Wis. Stat. § 632.32(4)(a)1 (1999–2000). A leading treatise on uninsured motorist coverage states:

> [T]he standard by which the conduct of insurers is judged arguably should be higher for uninsured motorist claims than it is for first party insurance coverages that are not mandated by statute. In other words, given the fact that uninsured motorist insurance is the subject of statutory requirements in forty-nine states, a persuasive argument can be made for the proposition that the duty of an insurer to act in good faith and fairly should be of the highest order claims arising under this coverage. The public interest in this cov-

appeals relied upon *Shrader* when it wrote that "[a]lthough a UM carrier may assert all defenses which would be available to the uninsured motorist, it still owes a duty of good faith and fair dealing to its insured/claimant." *Voland v. Farmers Ins. Co. of Ariz.*, 943 P.2d 808, 811 (Ariz. Ct. App. 1997).[8] The Washington Supreme Court has also held that "the duty of good faith and fair dealing survives within the UIM relationship. This is because, although the relationship becomes adversarial, the insured still has 'the reasonable expectation that he will be dealt with fairly and in good faith by his insurer. . . .'" *Ellwein v. Hartford Accident and Indem. Co.*, 15 P.3d 640, 647 (Wash. 2001) (quoting *Craft v. Econ. Fire & Cas. Co.*, 572 F.2d 565, 568–69 (7th Cir. 1978)). These statements are in

---

erage means that insurers should be obligated to exercise the greatest care and highest level of good faith and fair dealing.

2 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 20.4, at 242 (Revised 2d ed. 2000). *See also Shrader*, 882 P.2d at 826.

Because the present case does not concern uninsured motorist coverage we need not consider whether uninsured motorist coverage in this jurisdiction requires a higher standard of good faith and fair dealing.

[8] In *Voland v. Farmers Insurance Co. of Arizona*, 943 P.2d 808, 811 (Ariz. Ct. App. 1997), the court also noted that it generally agreed with certain observations set forth in *LeFevre v. Westberry*, 590 So. 2d 154, 159 (Ala. 1991). Although *Voland* quoted *LeFevre* at length, the opinion stopped short and did not quote *LeFevre*'s statement that "there can be no action based on the tort of bad faith based on conduct arising prior to [the time that the uninsured motorist's liability is fixed], only for subsequent bad faith." Given *Voland*'s omission of this portion of *LeFevre,* and its subsequent citation to *Shrader*, 882 P.2d at 826–27, we conclude that *Voland* did not agree with the Alabama court on this point.

accord with this court's analysis of the relationship between the insured and insurer. The duty of good faith and fair dealing is implied in the insurance contract. We interpret insurance contracts to meet the reasonable expectation of the insured. Therefore, we conclude that the correct view is that the duty of good faith and fair dealing exists at all times, including during the investigation, evaluation and processing of an underinsured motorist claim.

¶ 58. An insurer may at times have difficulty distinguishing legitimate claims from fraudulent claims, and should not be found to have acted in bad faith for thoroughly investigating a claim if its concerns are reasonable. Although an underinsured motorist carrier may assert all defenses that would be available to the underinsured motorist, the carrier still owes a duty of good faith and fair dealing to its insured during this investigation. An insurance company may " 'challenge claims which are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis.' " *Radlein v. Indus. Fire & Cas. Ins. Co.*, 117 Wis. 2d 605, 626, 345 N.W.2d 874 (1984) (quoting *Anderson*, 85 Wis. 2d at 693).[9]

¶ 59. In sum we hold the in the underinsured motorist insurance contract there is an implied covenant of good faith and fair dealing between the insured and the insurer. When this duty is breached, and the

___

[9] The discussion in *Radlein v. Industrial Fire & Casualty Insurance Co.*, 117 Wis. 2d 605, 345 N.W.2d 874 (1984) of a reducing clause was disapproved of as dicta in *Nicholson v. Home Insurance Co.*, 137 Wis. 2d 581, 602, 405 N.W.2d 327 (1987). This is not an issue in the present case.

insured incurs damages as a result of that breach, a claim for bad faith will lie.

## II

¶ 60. Auto-Owners also appeals the circuit court's denial of its motion for judgment notwithstanding the verdict in which it argued that there were fairly debatable issues precluding a finding of bad faith. Auto-Owners contends that causation, damages and negligence were all fairly debatable.

¶ 61. To establish a claim for bad faith, the insured "must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Anderson*, 85 Wis. 2d at 691. In the present case, the jury determined that Auto-Owners exercised bad faith. The circuit court denied Auto-Owners' motion after verdict to change this answer. Under these circumstances we apply a narrow standard of review. *Morden v. Cont'l AG*, 2000 WI 51, ¶ 38, 235 Wis. 2d 325, 611 N.W.2d 659. A jury verdict will be sustained if there is any credible evidence to support it. *Id.* "[I]f there is any credible evidence, under any reasonable view, that leads to an inference supporting the jury's finding, we will not overturn that finding." *Id.*

¶ 62. First, Auto-Owners asserts that negligence and its apportionment were reasonably debatable. According to Auto-Owners, in this intersection collision Kraus claimed to have made an emergency stop to avoid bicyclists in a crosswalk. In contrast, Ms. Danner and other witnesses testified that there were no bicyclists. Therefore, Auto-Owners asserts that negligence was fairly debatable at the time the case was submitted

to arbitration because it rested on credibility determinations.

¶ 63. The evidence adduced at trial showed, however, that as early as May 1990 Auto-Owners was apprised that Kraus was the cause of the accident. First, the police cited Kraus for failing to yield the right of way. Second, the report of adjuster Toivonen of Crawford and Co. Insurance Adjusters, hired by Auto-Owners, stated that there appeared to be no liability on the part of Ms. Danner. Third, in May 1993 Auto-Owners' attorney, McEldowney, apportioned negligence at 90 percent to Kraus, 10 percent to Ms. Danner. Accordingly, we are satisfied that the evidence and all reasonable inferences supports the conclusion that there is credible evidence to support the jury's verdict of bad faith, to wit, that negligence was not fairly debatable.

¶ 64. Next, Auto-Owners asserts that causation was fairly debatable. First, it contends that Dr. Tambornino, who conducted an examination of Ms. Danner at the behest of Auto-Owners, offered the opinion that she had a pre-existing back problem and that the April 1990 accident with Kraus did not cause her injuries. Second, it contends that two of plaintiffs' witnesses, Attorney Merrick Domnitz and Attorney George Curtis, testified that Danner's prior history could be evidence of a preexisting condition. Finally, Auto-Owners asserts that Ms. Danner's medical records revealed a longstanding history of lower back pain.

¶ 65. The evidence adduced at trial showed that during the years between the accident in April 1990 and Dr. Tambornino examination of Ms. Danner in February 1995 she was treated by three other physicians, Drs. Gmeiner, Langheim and Szmanda. All

78

three physicians stated, to a reasonable degree of medical certainty or probability, that the accident with Kraus was the cause of Danner's herniated disc.

¶ 66. . Attorney Domnitz testified that he did not believe that the cause of the injury and the value of the injury were reasonably debatable "because there's no legal proof on causation. Nothing that would be admissible in evidence." Attorney Domnitz also testified:

> [E]ven if Darci did have problems with her back going back to childhood that was aggravated by this automobile accident, that would be a compensable injury. An injury for which she would have the right to seek damages for the aggravation. That was what I talked about yesterday when I said it could be a cause instead of the cause.

¶ 67. Attorney Curtis testified as follows:

> Q: Do you think that Auto-Owners or McEldowney had a reasonable basis for concluding that the Danner claim was in some way debatable or questionable?

> A: No. There certainly was no basis on the negligence issue. The treating physicians were strong and unanimous. The insurance medical examiner was so weak that not only was his report something that wouldn't meet the standard of admissibility, but Mr. McEldowney complained to Mr. Ellis it was so weak and never even brought him to the arbitration. So there's no basis for a debate there.

Accordingly, we are satisfied that the evidence and all reasonable inferences supports the conclusion that there is credible evidence to support the jury's verdict of bad faith because causation was not fairly debatable.

¶ 68. Next, Auto-Owners contends that a substantial issue existed regarding the case's value. First,

Auto-Owners asserts that its own attorney valued the case from $10,000 to $150,000. It points out that plaintiffs valued the case from $175,000 to $300,000. Second, Auto-Owners asserts that personal injury claims are fairly debatable as a matter of law because such claims involve multiple factors subject to substantial differences of opinion. Third, Auto-Owners' expert, attorney Anderson, testified that the claim was not worth the plaintiff's lowest demand of $175,000.

¶ 69. Auto-Owners relies upon *Voland*, 942 P.2d at 812–13, in support of its argument on this point. In *Voland*, the Arizona court of appeals considered whether the implied covenant of good faith and fair dealing requires an uninsured motorist carrier to pay the amount of an unaccepted settlement offer that fully covers all aspects of an uninsured motorist claim before the insured executed a release or obtains an arbitration award. The court concluded that a payment in advance was not required. In support of its conclusion, the Arizona Court of Appeals wrote

> Unlike the stolen personal property and lost earnings claims involved in those cases, a personal injury claim is unique and generally not divisible or susceptible to relatively precise evaluation or calculation. The "pain and suffering"/general damage elements of a personal injury claim, for example, are inherently flexible and subject to differing and potentially changing evaluations based on various factors. In short, evaluating personal injury claims, and particularly the "general damage" component, is far from an exact science. Oftentimes it is no more precise or predictable than throwing darts at a board.

*Id.* The issue under consideration in *Voland* is distinguishable from the present case. We do not agree with

Auto-Owners' contention that personal injury claims are fairly debatable as a matter of law. Each case will turn upon its own facts.

¶ 70. The evidence adduced at trial established that the arbitrators awarded the Danners $220,050. The Danners' demands during negotiations ranged from $175,000 to $300,000. Auto-Owners' expert witness testified that, in his opinion, the value of the case was $150,000. Attorney Curtis testified that he believed the value of the case to be between $175,000 and $250,000.

¶ 71. The trial record also shows that as of April 1995 Auto-Owners' legal department was still uncertain as to the limits of liability available under the Danner policy. Auto-Owners' attorney Robert Ellis wrote in a memo:

> I do not believe that I have a good handle on the limits issue here. Am I to understand that if the claimant is a resident relative insured, she is entitled to stack all the vehicles on her parents' policy? If she was not living with the insured at the time of the loss, is she a mere "occupancy insured," and entitled only to the UIM benefits available for that vehicle? Please confirm how we are going to prove the facts on any limits issue and our chances of success.

In June of 1995 Attorney Ellis wrote a second memo stating "[p]lease confirm how many vehicles we did insure for Mr. Danner, and what the limits on those vehicles are. Please confirm what our total limits are for this claim." Given the confusion that apparently existed at Auto-Owners concerning stacking, even if it valued the case at the same amount the Danners did, it

apparently did not know if it could make such an offer. In a second memo in June 1995 Attorney Ellis wrote:

> The branch has requested authority in the amount of $125,000 to settle this matter. Prior to granting any authority, I have requested further information concerning whether or not Darcey (sic) Danner was insured on the vehicles which were not involved in this matter, and I have requested a full set of medical records for review.

We concur with the court of appeals that the jury in this case could find that "Auto-Owners' failure to act on the Danners' claim was not the result of exercising its right to fairly debate it." *Danner*, No. 99–1052, unpublished slip op. at ¶ 35 (Wis. Ct. App. May 2, 2000). We conclude therefore that the circuit court did not err in denying Auto-Owners' motion for judgment notwithstanding the verdict.

## III

¶ 72. Finally, Auto-Owners contends that the circuit court erred by granting the Danners' motion pursuant to Wis. Stat. § 805.14(5)(c) to change answers to two questions on the special verdict. A motion to change a jury's special verdict answer challenges the sufficiency of the evidence to sustain the answer. Wis. Stat. § 805.14(5)(c).

¶ 73. This case was presented to the jury in the form of a special verdict consisting of five questions, set forth below.[10] The jury answered "yes" to questions 1 and 2, finding that Auto-Owners exercised bad faith in denying the Danners' claim and that this bad faith was

---

[10] QUESTION #1: Did Auto-Owners Insurance Company exercise bad faith in denying the claim of the plaintiffs? ANSWER: Yes.

a cause of compensatory damages. As to question 3, the jury determined that $125,000 was the sum of money that would fairly and reasonably compensate the Danners for attorneys' fees and costs incurred as a proximate result of prosecuting their bad faith claim.

¶ 74. As to special verdict question 3 (b), concerning what sum of money would fairly and reasonably compensate the Danners and asking if attorneys' fees and costs incurred by the plaintiffs in the underlying claim, which included the arbitration hearing, caused by bad faith of the defendant, the jury answered "-0-."

QUESTION #2: If you answered Question #1 "Yes", then answer this question: Was such bad faith a cause of compensatory damages to the plaintiff? ANSWER: Yes.

QUESTION #3: If you answered Question #2 "Yes", then answer this question: What sum of money will fairly and reasonably compensate the plaintiffs for their damages in the following respects:

a) Attorney fees and costs incurred by the plaintiff which are the proximate result of prosecuting their bad faith claim? ANSWER: $125,000.

b) Attorney fees and costs incurred by the plaintiffs in the underlying claim, which included the arbitration hearing, caused by bad faith of the defendant? Answer: -0-

c) All other compensatory damages incurred by the plaintiffs which are the proximate result of the defendant's bad faith conduct? ANSWER: -0-

QUESTION #4: If you answered "Yes" to Question #1, answer this question: Did the defendant act maliciously towards the plaintiffs or in an intentional disregard of the rights of the plaintiffs? ANSWER: No.

QUESTION #5: If you answered the preceding question "Yes", answer this question: What sum, if any, do you assess against Auto-Owners Insurance as punitive damages? ANSWER: ——————.

¶ 75. The Danners filed a motion pursuant to Wis. Stat. § 805.14(5) for an order changing the answers to questions 3 (a) and (b) of the special verdict. As to question 3 (a), the Danners sought to have the jury's answer of $125,000 changed to $142,967.10.

¶ 76. Judge Kennedy granted the Danners' motion. The Judge changed the answer to question 3 (a) from $125,000 to $142,967.10. The answer to question (3)(b) was determined to be $81,012.97. As to question (3)(a), Judge Kennedy determined that there was no evidence to support $125,000; the only specific evidence offered was $142,967.10, and therefore he granted the Danners' motion to change the answer. As to question 3(b), the court determined that *DeChant* provides that plaintiff is entitled to an award for attorneys' fees in the underlying claim. Therefore, the judge changed the answer from -0- to $81,012.97.

¶ 77. First, as to question 3(a) we agree with the circuit court's changing the answer from $125,000 to $142,967.10. This was the only amount presented in evidence at the trial. No credible evidence exists in the record to support $125,000.

¶ 78. As to the second question, Auto-Owners argues that because the jury determined that it had exercised bad faith by denying the Danners' claim, but the jury did not award attorneys' fees and costs the plaintiffs incurred in prosecuting the arbitration hearing, the jury necessarily found that Auto-Owners did not exercise bad faith until after the arbitration hearing.

¶ 79. We conclude that there is no credible evidence to support the jury's verdict awarding zero for question 3(b). The Danners had entered into evidence proof that $81,012.97 in attorneys' fees had accrued in

the underlying claim. We held in *DeChant* that "a plaintiff is allowed to recover for all detriment proximately resulting from the insurer's bad faith, which includes both bond premiums and those attorney's fees that were incurred to obtain the policy benefits that would not have been incurred but for the insurer's tortious conduct." 200 Wis. 2d at 572–73 (footnote omitted). The special verdict does not indicate at what point it believed that Auto-Owners acted in bad faith. Further, as the court of appeals pointed out, the record does not contain any evidence of what fees were incurred before arbitration and what fees were incurred after arbitration. Accordingly, the record does not support a finding of zero for pursuing the underlying claim.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 80. ANN WALSH BRADLEY, J., did not participate.